**Affirmed and Opinion filed April 12, 2016.**



In The

# Fourteenth Court of Appeals

### NO. 14-15-00037-CR

**JONAS SMITH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 299th District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-DC-13-205993**

### O P I N I O N

Jonas Smith appeals his conviction for aggravated assault.[1]  He contends the trial court (1) erred by denying his "motion to suppress his warrantless arrest;" (2) abused its discretion by failing to grant a mistrial following complainant's reference to appellant's previous incarceration; and (3) abused its discretion by

---

[1] *See* Tex. Penal Code Ann. § 22.02(b)(1) (Vernon 2011).

"allowing a child witness to testify with the assistance of a service dog." We affirm.

## BACKGROUND

Appellant was indicted for committing an aggravated assault against complainant Lakeisha Toree Holman on October 15, 2013. A jury trial was held from September 29, 2014, to October 2, 2014.

At trial, complainant testified that she and appellant had known each other since high school but had started dating about two or three months before October 15, 2013. At the time, complainant lived in a house with her ten-year-old son, K.H., and four-year-old daughter, T.W. Complainant testified that appellant lived at his grandmother's house but often spent the night at her house.

Complainant testified that she and appellant had an argument on October 14, 2013; appellant did not spend the night at her house on that date. After complainant had gone grocery shopping with a friend on October 15, 2013, complainant called appellant's grandmother's house to "check on him and see where he was" because appellant had not answered her calls. When the grandmother told complainant that appellant was at home, complainant drove to the grandmother's house to talk to appellant. Complainant testified that there was no tension between appellant and her, and she invited appellant to come back to her house and help her unload the groceries she had bought. Appellant agreed.

When they arrived at complainant's house, appellant helped her unload the groceries. Complainant testified that she had asked appellant to take a shower while she started cooking dinner. After appellant had taken a shower, he sneaked up behind complainant while she was doing "something at the stove with some scissors." Complainant chastised appellant for sneaking up on her and then went

2

into the living room. While complainant was tidying up the living room, she heard noises from the kitchen that sounded like "when you're hitting knives or forks or anything against each other when you're looking for something in the drawer."

Shortly thereafter, appellant came around the corner to the living room holding a butcher knife in his hand and telling complainant: "[Y]ou know I kill you, right?" Complainant tried to talk to appellant but appellant had a blank look on his face and repeated: "[Y]ou know I kill you, right?" Appellant stabbed complainant in her arm. As she attempted to flee, appellant stabbed complainant in the back and then dragged her by her hair back into the house. Complainant testified that she reached back to pull the knife out of her back, and she threw it under the couch.

Complainant testified that she tried to fight off appellant but she was unsuccessful. She testified: "I was laying down on the floor at the point where I gave up and didn't fight anymore, he put his foot on my shoulder and told me he wanted to see me bleed out." Complainant started to pray and "told him that please help me, my son -- my kids, I don't want them to see me like this, you know, please help me." Complainant testified that appellant just stood there until K.H. came home. Appellant then picked complainant up with the help of K.H., took her to her car, and drove her to the hospital.

At the hospital, complainant told the staff that appellant had assaulted her and asked them to take care of K.H. Police then separated appellant and K.H. in the waiting area. Appellant was covered in blood. Complainant told the police that appellant had stabbed her, and appellant was arrested that evening. Complainant suffered injuries to her arm, back, kidney, and head. She testified that she had to have several surgeries because of the injuries she suffered and she would require more surgeries in the future.

3

A tape recording of an October 28, 2013 jail telephone conversation between appellant and complainant was played for the jury. During the jail call, complainant and appellant extensively discussed the assault. Complainant described the attack and said appellant had stabbed her in the arm, back, and the ear. She told appellant she could not hear or smile. She stated that she had had three surgeries already and two more were necessary. Complainant also stated: "[Y]ou told me you wanted me to die."

Appellant also testified at trial. Appellant agreed that he and complainant had an argument on October 14, 2013. He also agreed that complainant had invited him to come back to her house the next day on October 15, 2013, and help her unload groceries. He testified that he took a shower and then left complainant's house to run an errand. After he had returned late from running the errand and had no time to pick up complainant's daughter from daycare, complainant and appellant got into an argument.

According to appellant, complainant was jealous and first broke his cell phone, then swung at him with her left hand, and finally went to the kitchen to get "some scissors and a knife" to attack him. Appellant testified that he was "swinging, trying to grab this knife out of her hand." Appellant testified he "kind of lost it" and tried to not get hurt. He testified that he did not "remember all the events that took place after that" and the next thing he remembered was complainant laying on the floor and praying.

Appellant then heard K.H. come into the house. Appellant "told [K.H.] immediately when he came in to go to your -- go to your grandmother's house and call the police. Your mom tried to stab me." Appellant testified that K.H. just stood there. Appellant testified that he then "picked [complainant] up, put her in the car and took her to the hospital."

4

On cross-examination, appellant admitted that during an October 28, 2013 jail call with complainant, in which complainant had described the assault and how appellant had stabbed her in her arm, back, and ear, and told her he wanted her to die and bleed, appellant never accused complainant of attacking him with a knife or other weapon. Appellant stated several times during the jail call that he did not know how the assault happened.

The jury found appellant guilty, and the trial court assessed appellant's punishment at 27 years' confinement. Appellant timely filed this appeal.[2]

## ANALYSIS

In his first issue, appellant argues that the trial court erroneously denied his motion to suppress because he was arrested without a warrant. In his second issue, appellant argues that the trial court abused its discretion when it refused to grant a mistrial after complainant mentioned that appellant had been in prison before complainant and appellant started dating. In his third issue, appellant argues that the trial court abused its discretion by "allowing a child witness to testify with the help of a service dog." We address each issue in turn.

## I. Motion to Suppress

Appellant contends that the trial court erred by denying his "motion to suppress his warrantless arrest" because the State "failed to meet its burden of demonstrating the reasonableness of his warrantless arrest, and the evidence did not support any of the applicable exceptions provided by Tex. Code Crim. Proc. §§

---

[2] This appeal was transferred to the Fourteenth Court of Appeals from the Third Court of Appeals. In cases transferred by the Supreme Court of Texas from one court of appeals to another, the transferee court must decide the case in accordance with the precedent of the transferor court under the principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court. *See* Tex. R. App. P. 41.3.

5

14.01, 14.02, 14.03, or 14.04."

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We give almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness. *Martinez v. State*, 348 S.W.3d 919, 922-23 (Tex. Crim. App. 2011). We review pure questions of law and mixed questions of law and fact that do not depend on credibility determinations *de novo*. *Id*. at 923.

We view the evidence in the light most favorable to the trial court's ruling. *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). In a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of witnesses and the weight to be given their testimony. *See State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). If the trial court makes no explicit findings of fact, we imply fact findings to support the court's ruling when the evidence supports the implied findings. *Gutierrez*, 221 S.W.3d at 687. If the trial court's decision is correct on any theory of law applicable to the case, its decision will be sustained. *Ross*, 32 S.W.3d at 855-56.

Under the Fourth Amendment, a warrantless arrest is unreasonable per se unless it fits into one of a "few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993); *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005). A police officer may arrest an individual without a warrant only if probable cause exists and the arrest falls within one of the exceptions set out in the Code of Criminal Procedure. *Torres*, 182 S.W.3d at 901; *see* Tex. Code Crim. Proc. Ann. arts. 14.01-.04 (Vernon 2015 & Supp. 2015).

Probable cause for a warrantless arrest requires the officer to have a

6

reasonable belief that, based on the facts and circumstances within the officer's personal knowledge or of which the officer has reasonably trustworthy information, an offense has been committed. *Torres*, 182 S.W.3d at 901-02. Information received from private citizens who witness a criminal act may be regarded as inherently reliable. *Cornejo v. State*, 917 S.W.2d 480, 483 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) (citing *Esco v. State*, 668 S.W.2d 358, 360-61 (Tex. Crim. App. [Panel Op.] 1982)); *see LeCourias v. State*, 341 S.W.3d 483, 488 (Tex. App.—Houston [14th Dist.] 2011, no pet.). This rule also applies if the citizen is the victim of a crime. *Cornejo,* 917 S.W.2d at 483. Probable cause must be based on specific, articulable facts rather than the officer's mere opinion. *Torres*, 182 S.W.3d at 902. We use the "totality of the circumstances" test to determine whether probable cause existed for a warrantless arrest. *Id*.

The Texas Code of Criminal Procedure permits warrantless arrests in situations where police officers have probable cause to believe a person committed an offense involving family violence. Tex. Code Crim. Proc. Ann. art. 14.03(a)(4). Family violence includes acts committed against one victim with whom the actor has or has had a dating relationship that are intended to result in physical harm, bodily injury, or assault. *See id*. art. 5.02. (Vernon 2015); Tex. Fam. Code Ann. §§ 71.004(3), 71.0021(a) (Vernon Supp. 2015).

Here, the totality of the circumstances supported a reasonable belief that appellant had committed an act of family violence.

At the motion to suppress hearing, Police Officer Joseph Poswalk testified that he was called to St. David's Medical Center on October 15, 2013, at approximately 8:30 p.m. in regard to "an assault that had taken place." When Officer Poswalk arrived at the hospital, he saw appellant in a waiting room

7

"already being detained by other law enforcement officers" as a possible suspect of the assault. Appellant was not under arrest at the time.

Officer Poswalk testified that he was in charge of watching over appellant "while other parts of the investigation were taking place." Officer Poswalk testified that "other police officers gather[ed] information from the alleged victim of the assault." According to Officer Poswalk, complainant had told investigating police officers that she had been "stabbed and then also stomped on" by "her boyfriend, Jonas Smith." Complainant had told officers that appellant had been a friend for a long time and that she and appellant had been dating for two or three months. Officer Poswalk testified that officers were also gathering information from complainant's doctors and nurses to "try to determine the level of her injuries."

Officer Poswalk testified that appellant, appellant's shirt, and appellant's sandals were covered in blood, which Officer Poswalk believed was "consistent with an assault having taken place." Officer Poswalk stated that the police investigated the assault for about one hour "before a decision was made to arrest Jonas Smith." Officer Poswalk stated that the decision to arrest appellant was not made until all the information regarding complainant's assault was gathered. Officer Poswalk was asked: "And based on the information that was known to the police at the time the decision was made to arrest Jonas Smith, was there probable cause to believe that he had committed an offense involving family violence?" He responded: "Yes, ma'am." Officer Poswalk testified that he arrested appellant without a warrant.

We reject appellant's contention that the "State failed to meet its burden to justify an arrest pursuant to Tex. Code Crim. Proc. § 14.03(a)(4) (the "family violence" exception)."

8

Appellant contends that Officer "Poswalk did not offer specific, articulable facts to show whether he became aware of the alleged domestic relationship before or after he effected Appellant's arrest."

To preserve a complaint for review, the record must show that a specific and timely complaint was made to the trial judge and the trial judge ruled on the complaint. *Lovill v. State*, 319 S.W.3d 687, 691 (Tex. Crim. App. 2009); *see* Tex. R. App. P. 33.1(a). A complaint is not preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial. *Lovill*, 319 S.W.3d at 691-92. Appellant did not make this complaint in the trial court. Instead, appellant argued that "[t]o make a warrantless arrest under the statute for assault, there must be a continuing danger to the alleged victim, and that has not been established through the testimony." Therefore, appellant has not preserved the domestic-relationship argument for appeal. *See* Tex. R. App. P. 33.1(a); *Lovill*, 319 S.W.3d at 692. Even if appellant had preserved this argument, it is without merit in light of Officer Poswalk's testimony.

We also reject appellant's contention that his warrantless arrest was unlawful because Officer "Poswalk conceded there was no 'danger of further bodily injury' to the complainant at the time of Appellant's arrest." Nothing in Texas Code of Criminal Procedure article 14.03(a)(4) requires a complainant to be in "danger of further bodily injury" at the time of appellant's arrest. *See* Tex. Code Crim. Proc. Ann. art. 14.03(a)(4). Article 14.03(a)(4) provides that "Any peace officer may arrest, without warrant . . . persons who[m] the peace officer has probable cause to believe have committed an offense involving family violence." *Id*.

Appellant confuses the requirements of article 14.03(a)(4) with the requirements of article 14.03(a)(2), which provides that "Any peace officer may

9

arrest, without warrant . . . persons who[m] the peace officer has probable cause to believe have committed an assault resulting in bodily injury to another person and the peace officer has probable cause to believe that there is danger of further bodily injury to that person." *See id*. art. 14.03(a)(2). Appellant was not arrested pursuant to article 14.03(a)(2); instead, appellant was arrested pursuant to article 14.03(a)(4).

The evidence presented at the motion to suppress hearing supports a reasonable belief that appellant had committed an offense involving family violence. Because appellant's arrest was lawful pursuant to article 14.03(a)(4), the trial court did not err by denying appellant's motion to suppress.

Accordingly, we overrule appellant's first issue.

## II.  Mistrial Ruling

Appellant challenges the trial court's denial of his motion for mistrial following complainant's reference during her testimony to appellant's previous incarceration.

We review the denial of a motion for mistrial for an abuse of discretion. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). A trial court does not abuse its discretion unless its decision falls outside the zone of reasonable disagreement. *Id*.

A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Young v. State*, 283 S.W.3d 854, 878 (Tex. Crim. App. 2009); *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). A trial court may properly exercise its discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal

due to an obvious procedural error. *Ladd*, 3 S.W.3d at 567. "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). The determination of whether an error necessitates a mistrial must be made by examining the facts of each case. *Ladd*, 3 S.W.3d at 567.

During direct examination, complainant identified appellant in the courtroom and then was asked about her living arrangement with appellant. Complainant testified as follows:

> [THE STATE:] Did [appellant] live with you under some formal arrangement, like was he paying rent or anything?
>
> [COMPLAINANT:] No.
>
> [THE STATE:] How did he come to be living with you?
>
> [COMPLAINANT:] He actually -- he was really staying with his grandmother. And when he got out of jail that last time that he had went, he kind of stayed at my house some of the time, between my house and his grandmother's house.
>
> [THE STATE:] And let's just talk about --
>
> [APPELLANT'S COUNSEL:] May I approach, Your Honor?
>
> THE COURT: You may.
>
>             \*            \*            \*
>
> THE COURT: Would you like a limiting instruction?
>
> [APPELLANT'S COUNSEL:] Yes, to disregard any -- that last response.
>
>             \*            \*            \*
>
> THE COURT: Ladies and gentlemen of the jury, the last answer that the witness gave will be stricken from the record and disregard her statement, and I will give you a further limiting instruction at the time of the jury instructions.
>
> [APPELLANT'S COUNSEL:] The Defense would move for a mistrial at this time.

THE COURT: That motion is denied.

Unless clearly calculated to inflame the minds of the jury or of such damning character as to make it impossible to remove the harmful impression from the jurors' minds, a witness's reference to a defendant's criminal history or previous incarceration, standing alone, generally is cured by a prompt instruction to disregard. *See Ladd*, 3 S.W.3d at 571 (instruction to disregard cured witness's improper reference to defendant's multiple juvenile arrests); *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992) ("We find the uninvited and unembellished reference to appellant's prior incarceration—although inadmissible—was not so inflammatory as to undermine the efficacy of the trial court's instruction to disregard."); *Nobles v. State*, 843 S.W.2d 503, 514 (Tex. Crim. App. 1992) (witness's statement that defendant "didn't want to go back to prison" cured by prompt instruction to disregard); *Gardner v. State*, 730 S.W.2d 675, 696-97 (Tex. Crim. App. 1987) (witness's statement that "[appellant] told me that even when he was in the penitentiary, that he had stomach problems" was cured by trial court's instruction to disregard); *Jackson v. State*, 287 S.W.3d 346, 354 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (complainant's two references to appellant's previous incarceration were cured by instruction to disregard). "[O]nly in the most egregious cases when there is an 'extremely inflammatory statement' is an instruction to disregard . . . considered an insufficient response by the trial court." *Williams v. State*, 417 S.W.3d 162, 176 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (citations omitted).

This case does not involve circumstances under which the harmful impression could not be removed from the jurors' minds. Nothing in the record indicates that complainant's reference to appellant's previous incarceration clearly was calculated to inflame the minds of the jury. *See Jackson*, 287 S.W.3d at 354.

12

Complainant's reference to appellant's previous incarceration was uninvited and unembellished and mirrored those references typically cured by an instruction to disregard. *See Ladd*, 3 S.W.3d at 571; *Kemp*, 846 S.W.2d at 308; *Nobles*, 843 S.W.2d at 514; *Gardner*, 730 S.W.2d at 696-97; *Jackson*, 287 S.W.3d at 354. Because the trial court gave a prompt and appropriate curative instruction to the jury to disregard complainant's reference to appellant's previous incarceration, the trial court acted within its discretion when it denied appellant's motion for mistrial.

Accordingly, we overrule appellant's second issue.

## III. Service Dog

Appellant argues that the trial court abused its discretion by "allowing a child witness to testify with the assistance of a service dog."

Before trial, the following exchange occurred when the State informed the trial court that a service dog may be in the courtroom during the testimony of complainant's son K.H.:

> [THE STATE]: Your Honor, this does not relate to the motion to suppress. I just wanted to make the Court and [appellant's counsel] aware that we do have a juvenile witness testifying in this case, and he has the opportunity to connect with a service dog that is available at the Children's Advocacy Center. That's been available to him, and he has expressed interest.
>
> And so at the time of his testimony tomorrow the service dog may be employed. I'm not sure that that's happened in this court before. I know it's happened in other district courts in this building. But I wanted to raise the Court's awareness of that now.
>
> THE COURT: Are you going to have any objection?
>
> [APPELLANT'S COUNSEL]: I love dogs.
>
> THE COURT: There we go.

Then, before opening statements, the following exchange occurred outside the presence of the jury:

THE COURT: So the issue, on the record, is the Defense has asked about the service dog. We have a ten-year-old that will be testifying later today. A service dog has been provided to aid him in his testimony. And so maybe the State can better answer what the use of service dogs, you know, promotes or why.

[THE STATE]: Well, I think it's generally for the child's comfort and anxiety and mental well-being while they're in the scary setting of the courtroom.

[THE STATE]: The child is ten, and he's testifying about a violent event that he witnessed involving his mother. He is seeing a therapist connected with this event.

[THE STATE]: He also has not been in the presence of the defendant since the night of the arrest and the assault itself, so this will be his -- just coming in the courtroom just now was his first opportunity to view the defendant since it happened.

[THE STATE]: And the service dog is going to be at the child's feet outside of the view of the jury. It's very unobtrusive and not a distraction, and we don't see how that could be prejudicial.

[APPELLANT'S COUNSEL]: Will it be inside the box?

[THE STATE]: The dog's going to be sitting inside the box.

THE COURT: And what we'll do is we'll excuse the jury, seat the child and the dog. The therapist will be behind, the therapist relating to the dog, the handler of the dog, so that if the dog acts up or anything, that she's there to handle it, which is how I understand it's usually done.

[APPELLANT'S COUNSEL]: So she'll just be sitting in a chair?

THE COURT: In a chair behind, yes. And that will all happen -- they'll all be seated, and then the jury will come in so they won't see. Then when the child is excused, they might see the dog wander out, but then it's after the testimony.

[APPELLANT'S COUNSEL]: Okay. Well, I would just lodge an objection. I think it's overly prejudicial.

THE COURT: I'll overrule the objection and note it for the record.

In his brief, appellant acknowledges that his sole objection in the trial court regarding the presence of the service dog was that it was "overly prejudicial."

Appellant further acknowledges that he "did not object on grounds that the trial court failed to adhere to the procedures set out in Tex. Code Crim. Proc. Ann. § 38.074" and is therefore "presently constrained from urging error on this basis." Appellant nonetheless argues that "the contents of" article 38.074 are "germane to [his] objection on the basis of prejudice" and quotes the language of article 38.074 in his brief. Article 38.074 governs testimony of a child in prosecution of an offense.

Article 38.074, section 1(2) provides that a "'[s]upport person' means any person whose presence would contribute to the welfare and well-being of a child." Tex. Code Crim. Proc. Ann. art. 38.074, § 1(2) (Vernon Supp. 2015). Section 3(b) provides that "[o]n the motion of any party . . ., the court shall allow the child to have a toy, blanket, or similar comforting item in the child's possession while testifying or allow a support person to be present in close proximity to the child during the child's testimony if the court finds by a preponderance of the evidence that: (1) the child cannot reliably testify without the possession of the item or presence of the support person, as applicable; and (2) granting the motion is not likely to prejudice the trier of fact in evaluating the child's testimony." *Id*. § 3(b) (Vernon Supp. 2015). Section 3(d) provides that the "court may set any other conditions and limitations on the taking of the testimony of a child that it finds just and appropriate, considering the interests of the child, the rights of the defendant, and any other relevant factors." *Id*. § 3(d) (Vernon Supp. 2015).

Appellant argues in his brief that (1) the "definition of 'support person' in Section 1(2) specifically references a 'person,' not an animal;" (2) a "canine seated nearby is not the equivalent of a 'toy, blanket, or similar comforting item in the child's possession;'" (3) taking "measures to reduce the dog's visibility . . . does not mean the jury was unaware of the animal's presence;" (4) "the State did not in

15

any way establish that the dog was required in order for [K.H.] to ably testify;" and (5) there was "no indication that [K.H.] needed to avail himself of the dog, or that he had even interacted with the dog prior to taking the stand." Therefore, appellant asserts that the "trial court abused its discretion by allowing the use of the service dog in this instance," and "it is impossible to determine whether the dog's presence influenced the ultimate verdict, and as a result, the conviction must be reversed and the cause remanded to the trial court for a new trial."

Because appellant did not make any of these arguments in the trial court, they present nothing for our review. *See* Tex. R. App. P. 33.1(a); *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011). Appellant's only objection with regard to a service dog sitting in the witness box during K.H.'s testimony was: "I think it's overly prejudicial." Assuming this objection preserved a complaint under section 3(b)(2) regarding prejudice from the service dog's presence, the record does not establish error.

Before allowing ten-year-old K.H. to testify, the trial court gave the State and appellant an opportunity to present arguments. The State explained that a service dog's presence is "generally for the child's comfort and anxiety and mental well-being." The State further explained that (1) K.H. is ten years old and "in the scary setting of the courtroom;" (2) K.H. has to testify "about a violent event that he witnessed involving his mother;" (3) K.H. has not been in appellant's presence since the night of his mother's assault; (4) "the service dog is going to be at [K.H.]'s feet outside of the view of the jury;" and (5) the "dog's going to be sitting inside the [witness] box."

During the hearing, the trial court assured appellant that it would excuse the jury before seating the service dog and K.H. The trial court also stated: "And [w]hat will all happen -- they'll all be seated, and then the jury will come in so they

16

won't see." Appellant did not present any evidence or argument at the hearing that the jury likely would be prejudiced by the presence of the service dog in the witness box. Based on the record before us, we conclude that the trial court did not err by finding that the service dog's presence was not likely to prejudice the jury in evaluating K.H.'s testimony. *See Coronado v. State*, 431 S.W.3d 744, 748 (Tex. App.—Amarillo 2014, pet. ref'd) ("We find there was a preponderance of evidence supporting the trial court's determination that the presence of a support person was not likely to prejudice the trier of fact in evaluating the child's testimony.").

Even assuming for the sake of argument that the trial court erroneously allowed the service dog to be in the witness box during K.H.'s testimony, any alleged error was harmless.

Appellant's brief does not identify any harm from the use of a service dog. Appellant does not argue that the trial court's alleged error was constitutional and, because this asserted error does not implicate constitutional rights, Texas Rule of Appellate Procedure 44.2(b) governs the harm analysis. *See, e.g.*, *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008).

Under Texas Rule of Appellate Procedure 44.2(b), a non-constitutional error "that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b); *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Schmutz*, 440 S.W.3d at 39. If the error did not influence the jury, or had only a slight effect, the error is harmless. *Tillman v. State*, 376 S.W.3d 188, 198 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

In assessing the likelihood that the jury's decision was adversely affected by the alleged error, an appellate court considers everything in the record. *Schmutz*,

440 S.W.3d at 39. This includes testimony, physical evidence, jury instructions, the State's theories and any defensive theories, closing arguments, and voir dire, if applicable. *Id.* Important factors include the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. *Id.*

The record shows that the trial court did not allow the jury to be in the courtroom until K.H. and the service dog were seated on the witness stand. The trial court excused the jury and announced, "[W]e're going to take a short afternoon break and we'll be back here in ten minutes." Outside the jury's presence, the trial court seated K.H. and the dog. At the conclusion of K.H.'s testimony, the trial court announced, "Okay. We're going to have one more. This will be our last quick break in the afternoon, so just another ten minutes." After the jury exited the courtroom, the trial court excused K.H. and the dog from the witness stand, stating: "Okay, [K.H.], you did good. You can go." Thus, the jury was not present either when K.H. and the dog entered or later when they left the courtroom. Nor is there anything in the record to suggest that the jury saw or knew that a service dog had been in the courtroom and in the witness stand during K.H.'s testimony.

Even assuming that the jury saw the service dog and the dog's presence somehow evoked the jury's sympathy toward K.H. and unduly validated K.H.'s credibility, K.H.'s testimony could hardly have influenced the jury in finding appellant guilty. K.H. testified that he came home the night of the assault and saw complainant on the kitchen floor bleeding from her arm and appellant standing next to her. K.H. testified that he did not see complainant or appellant holding anything in their hands. K.H. testified that complainant seemed to be scared; complainant was bleeding and "her arm was cut open." K.H. helped complainant

get up and get into her car. Appellant, complainant, and K.H. then drove to the hospital. K.H. never testified that he saw appellant hurt complainant in any way; he testified that he "didn't actually see how [complainant] got hurt."

Further, complainant testified in detail how appellant assaulted her the night of October 15, 2013. The jury also heard complainant's and appellant's October 28, 2013 jail call conversation, in which complainant, who was still very distraught, described the attack and that appellant had stabbed her in the arm, back, and ear. The jury heard complainant tell appellant: "you told me you wanted me to die." The jury also heard appellant never denying that he had assaulted complainant; instead, the jury heard appellant tell complainant repeatedly that he did not know "how this s_ _ _ happened."

Based on the record before us, we conclude that any alleged error in allowing the service dog to be present during K.H.'s testimony was harmless. Accordingly, we overrule appellant's third issue.

## CONCLUSION

We affirm the trial court's judgment.


/s/     William J. Boyce
        Justice


Panel consists of Chief Justice Frost and Justices Boyce and Wise.
Publish — Tex. R. App. P. 47.2(b).