# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00373-CR

---

**Jeffrey Wayne Garner, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 299TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-DC-20-203531, THE HONORABLE KAREN SAGE, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant Jeffrey Wayne Garner, Jr. appeals his murder conviction on sufficiency and evidentiary grounds. We affirm.

## BACKGROUND

Garner arrived at a gathering of friends and family hosted by Alaiha Briggs; confronted Briggs' cousin, James Allen, Jr.; and shot him in the chest. Allen jogged away a few yards and collapsed, and after unsuccessful CPR, a paramedic pronounced him dead at the scene.

Responding officers recovered a "Sig Sauer 380 Auto spent cartridge case" on the ground near where Allen had been shot. The medical examiner determined the bullet had entered on the left side of Allen's chest; punctured his left rib, his heart, and his right lung; and exited out the right side of his back.

Sergeant Tonya Thomas arrived at what she described as a "chaotic scene." She heard many different people saying, "Don't say anything. Don't say anything. You know, let us take care of it. Don't deal with the police." She observed that "[n]o one was really responsive to what the officers were saying or wanting to cooperate with the police." But she also heard a female, later identified as Briggs, say "they shot my relative" and "I was right there." Sergeant Thomas interviewed Briggs, who identified a suspect—Garner. Although Briggs did not know Garner, she knew who he was and was able to pull up a Facebook photo to show to Sergeant Thomas.

Briggs had hosted the gathering that day at her grandmother's apartment at the Springdale Estates. Samara Davis came over with her three children. Garner was the father of the youngest of Davis's children—a six-month old. Garner lived with Davis (though he slept on the couch), and they were raising the children together. Davis had gone to the gathering to let her children play with Briggs' children and to do the family's laundry. Garner, meanwhile, went to a gambling parlor with his brother.

According to Briggs and others, Davis flirted with Allen (who was wearing a white t-shirt) and vice versa. But Allen later flirted with another woman, making Davis jealous. Davis got "aggressive and offensive," and then Allen "trying to apologize in a type of way," "playfully" slapped her on the butt, but Davis "took it overboard." She yelled, "don't touch me." Davis made "a big scene" and said, "I'm gonna call my baby daddy right now. He's going to come whoop you. And stuff like that."

According to Davis, she never flirted with Allen.[1]  Allen was there when she got there, and he tried to pursue a conversation with her.  She told him "I'm not interested in talking to no older men," and he called her a "bitch."  She emphatically denied ever flirting with Allen and was doing the "exact opposite."  She asserted Allen nevertheless made unwanted advances towards her and groped her.  This eventually led her to gather her children and retreat to her parked minivan to call Garner.  While gathering her children, she found her older daughter on the couch, the baby in the stroller, and her son taking a bath with Briggs's children.  But the female friend who was bathing the children was not in the bathroom; instead, Briggs's grandfather Ruben Johnson, "a known sex offender," was with the children.  She cussed him out.

Once she was in the minivan, she called Garner and asked for help.  When she called, she was "enraged," "scared," had "just got frisked," and had found her "son in the restroom with a stranger and undressed," and she told Garner what had happened.  She said that even though she was in the van, Allen, who had followed her outside, was still posing an immediate threat to her.  She said she just waited instead of driving off because she had not gotten her clothes out of the laundry and was scared to go back in the apartment.  She just wanted Garner to come get her clothes out of the apartment "and escort me and my kids home."

The minivan had been backed into an area between two empty handicapped spots just a few doors down from the front of the apartment.  Allen, in his white t-shirt, and Johnson, in a white t-shirt and a white cap, lingered near the tailgate of a truck that had also been backed in, two spots over, directly in front of the apartment.  The truck's passenger side was facing the

---

[1] Davis and Garner represented they did not know anyone at the gathering except for Briggs.  They referred to James Allen as the man wearing the white shirt and no hat.  They referred to Brigg's grandfather Ruben Johnson, as the man wearing the white shirt and white hat.  We here use those descriptions, and the men's names, interchangeably.  There was no confusion about who was who.

3

minivan's driver's side. Multiple people walked in and out of the open door to the apartment and between and around the vehicles.

When Garner arrived, he walked around the front of Davis's minivan. Davis got out of the driver's seat, and she and Garner walked a few more steps to come face to face with the two men in white—Allen and Johnson. Allen and Johnson had themselves moved a couple yards towards them, so that the four squared up in the back of the empty spot between the two vehicles. Multiple other people who were standing around encircled the group—mainly at Garner's and Davis's back. Within thirty seconds of arriving, Garner pulled a handgun out of his waistband, then raised his right hand and fired a single shot at Allen. He then walked back the way he had come. Davis drove off with the kids in her minivan.

Four other cars left the scene before the police showed up. A Springdale Estates surveillance video camera captured six minutes up to the shooting, the shooting, and the five minutes until the police showed up. The camera did not record sound, and some aspects of the shooting and Allen's collapse were obscured by people and/or vehicles. Police arrested Garner the next day at Davis's mother's residence, and he was charged with murder.

At trial, the State put on several witnesses including Briggs, Johnson, Davis, and Sergeant Thomas. The trial court admitted the surveillance video in three exhibits—two just capturing the shooting and a third capturing the full eleven minutes. Garner testified that he shot Allen in self-defense and to protect his family and others.

The jury was charged on self-defense and defense of a third person, but the jury rejected the defenses and found Garner guilty of murder. After finding Garner had not acted in sudden passion, the jury assessed punishment at 30 years imprisonment, and the trial court sentenced Garner accordingly. Garner appeals.

4

**ANALYSIS**

***Sufficiency of the Evidence***

In his first issue, Garner argues that the State presented no evidence to contradict his testimony that he acted in a manner to protect his life and others after perceiving a threat in the environment where he found himself. And because the State failed to produce sufficient evidence to disprove his self-defense and defense of third parties claim, he says his conviction should be reversed and a judgment of acquittal rendered.

Standard of Review

The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence. *See Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979). In assessing the sufficiency of the evidence to support a criminal conviction, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

"[I]n a claim of self-defense or defense of third persons that would justify a defendant's use of force against another, the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues." *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). "The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue." *Id.* By contrast, the State's burden of persuasion requires only that the State prove its case beyond a reasonable doubt. *Id.* To resolve the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but to whether any rational trier of fact would have found the essential elements

5

of the offense beyond a reasonable doubt and would have found against appellant on the self-defense issue beyond a reasonable doubt. *Id*. at 609.

<u>Application</u>

First, any rational trier of fact could have found the essential elements of murder beyond a reasonable doubt. As charged in this case, a person commits the offense of murder if he (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code § 19.02(b)(1), (2). Garner testified and admitted that he walked up and shot Allen in the chest. The offense was captured on surveillance video—albeit with Garner's back to the camera. It shows Garner walking up and lifting his right arm. A second later, everyone immediately scattered, while Garner walked away carrying a gun in his right hand. The jury could find, from Garner's admission to the conduct captured on the videotape, that Garner either intentionally or knowingly caused Allen's death or only intended to cause Allen serious bodily injury but committed an act clearly dangerous to human life that caused Allen's death. *Jackson*, 443 U.S. at 315–16; *Hooper*, 214 S.W.3d at 13.

Second, any rational trier of fact could have found against Garner on the self-defense issue beyond a reasonable doubt. The Texas Penal Code provides that deadly force used in self-defense or in defense of another is a defense to prosecution for murder if that use of force is "justified." Tex. Penal Code §§ 9.02, .31-.33. A person is justified in using deadly force against another, inter alia, when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor or the third person against the other's use or attempted use of unlawful deadly force. *Id*. §§ 9.32(a), .33(1), (2). A "reasonable belief" in this context is

6

defined as one "that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id*. § 1.07(a)(42).

Garner bore his burden of production by testifying in a manner that would support a rational finding in his favor on the defensive issue; his testimony was not inconsistent with the video. *Braughton*, 569 S.W.3d at 608. Garner testified that on the morning of the shooting, he had made breakfast for Davis and the children. Davis then took him to pick up his car from a mechanic, and then he went downtown "to go gamble, play cards, dominos, dice," with his brother and his brother's friends. He had been gambling for five or six hours when he got a call from Davis.

At first, he only heard Davis arguing with a male. He heard Davis say, "Get away from me. Get the fuck away from me." Garner described the male voice as, "Aggressive, angry." Davis briefly described the situation to him and let him know that she and the kids were still at Briggs's. The call cut out, and because he could not dial or text out on his phone, he was unable to return Davis's call.

Garner left the gambling parlor and drove to the Springdale Estates. He was thinking Davis and the kids were trapped inside the apartment against their will. He wanted to get his "babies out of, like, a chaotic environment that they didn't belong in in the first place." He was especially concerned about the six-month-old because he knew she could not "pull herself out of harm's way." He parked on the road outside of the apartments. He testified he carried his gun because "I didn't know what I was fixing to walk into. I just knew it was going to be danger."

As he walked into the parking lot, he saw Davis's minivan, a pickup truck, and "a lot of people standing outside." He heard Davis still arguing with the angry male (who was wearing a white shirt). He heard a second male (who was wearing a white shirt and hat) arguing

7

with the angry male too. Garner said as he walked towards the group his heart was beating fast; he knew Davis could not help him. He acknowledged he appears calm in the surveillance video as he walks up but said he was scared and worried. And he acknowledged his hand was at his waist but said he was just holding his pants up by the belt loop. They were falling because of the weight of the gun. The angry male then locked eyes with him and came around the truck towards him. The man with the white hat "was right there on his side," and they "both engaged on me."

Allen said something "threatening," and Garner put his left hand up with his palm facing the men and told them, "I got my pistol. Back up." The men did not back up; instead, the angry male reached for his hip, "as if he had a holster on his hip."

Although Garner did not see an actual gun, he thought the angry male was trying to "harm me and my kids"; he was "terrified" not just of him, but of the whole situation. Because "It's like seven people surrounding me. I don't know who none of them is. Two of them are physically confronting me and verbally threatening me" and one had reached for a weapon. He shot because "I'm the leader for my family. I'm coming over to protect them." If Allen had shot at him with the gun he thought Allen had, the bullet could have struck him, the minivan, and any people behind him. Garner acknowledged that, on the surveillance video, he appeared to walk away calmly, but on the inside, his "heart was racing." He had no intention to kill the man, and when he walked away, he threw the gun "in the gutter."

While this is certainly some evidence that could justify the use of deadly force in self-defense or in defense of third persons, the jury could have rejected it and found that the State met its burden of persuasion to disprove Garner's defense. *Id.* at 612; *see also Perales v. State*, 622 S.W.3d 575, 582 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) (explaining that factfinder "was free to disregard appellant's self-serving testimony"). Such a rejection would be rational

8

considering the remaining evidence in the record. Three eyewitnesses—Briggs, Johnson, and Davis—testified that they did not see Allen with a gun or did not understand why Garner shot Allen.

Briggs testified that Garner showed up and that "You could just tell the boy had some aggression on his chest." She heard him ask, "Which one is it?" Briggs assumed they would fight. As Garner approached, she could not see a gun, and it just "looked like he was holding his pants up." But Garner shot Allen. "And like after the incident, like I thought the only reason that the shooting occurred or whatever was because he thought my cousin was too big for him to fight." Allen was "stocky by the shoulders" but Garner was skinny. Briggs testified, "My cousin didn't have no gun on him." And, if Davis "didn't blow things out of proportion," "this boy would have never came," and Allen "would still be alive."

Johnson testified that after Davis told Allen, "I got a man," and "I'm fixing to go get him," and Allen said, "Go get him," he tried to calm Allen down. He told Allen, "Shut up, man." But when he saw Garner walk up, he knew there would be a confrontation. He approached alongside Allen and Garner told him, "Get back" and "That's my wife." Garner then raised his arm up, and Johnson could see the barrel aimed at him. Garner then pointed the gun at Allen. "The gun went pow. Just happened so fast. So it wasn't even worth the time. I don't even know why he even did it." And Davis testified that she was shocked Garner brought a gun, and she did not see Allen with one.

As the State notes, Garner left the scene immediately, discarded the gun, and, at least until the next day, avoided detention—actions from which the jury could infer a consciousness of guilt. *Clayton v. State*, 235 S.W.3d 772, 781 (Tex. Crim. App. 2007); *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994).

9

Given the consistency of the surveillance video with these witnesses' testimony, and Garner's own admissions to the conduct and his calm appearance, any juror could have rationally (1) found Garner's testimony that he believed Allen was about to shoot him or endanger the third parties incredible, or (2) found Garner's testimony that he believed Allen was about to shoot him or endanger the third parties credible, but also found that Garner's belief was unreasonable—not one "that would be held by an ordinary and prudent man in the same circumstances" as Garner. *See* Tex. Penal Code §§ 1.07(a)(42), 9.32(a), .33(1), (2).

The trier of fact—not this Court—was called upon to decide if Garner's actions were justified under the Penal Code. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992). And the trier of fact—not this Court—was free to accept or reject all or any portion of Garner's testimony. *Id*. Evaluating the evidence in the light most favorable to the trier of fact's determinations—including its rejection of Garner's defense—we find that there is sufficient evidence in the case before us. *Braughton*, 569 S.W.3d at 608.

We overrule Garner's first issue.

### *Failure to Grant Mistrial*

In his second issue, Garner claims the trial court abused its discretion in failing to grant a mistrial when a State's witness stated during the guilt/innocence phase that she had been told that Garner had just gotten out of jail. He asks that the case be reversed and remanded for a new trial.

Standard of Review and Applicable Law

Where, as here, the trial court sustained the defense objection and granted the requested instruction to disregard, the only adverse ruling—and thus the only occasion for making

10

a mistake—was the trial court's denial of the motion for mistrial. *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004). "Under those circumstances, the proper issue is whether the refusal to grant the mistrial was an abuse of discretion." *Id*. Ordinarily a prompt instruction to disregard will cure error or prejudice from a witness's inadvertent and nonresponsive answer—even one suggesting an extraneous offense. *Sandoval v. State*, 665 S.W.3d 496, 529 (Tex. Crim. App. 2022).

A mistrial is appropriate only when the improper conduct was "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins*, 135 S.W.3d at 77. In determining whether the trial court abused its discretion by denying a motion for mistrial we consider (1) the magnitude of the prejudicial effect of the remarks; (2) the efficacy of any cautionary instruction by the judge; and (3) the strength of the evidence supporting the conviction. *Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007); *Hawkins*, 135 S.W.3d at 77.

Application

At trial, during the prosecutor's direct examination of Sergeant Thomas about her interview with Briggs, the following exchange occurred:

Q. And without telling me exactly what she said, was she able to identify a suspect?

A. Yes, she was.

Q. And what was the name that she gave you?

A. She first started describing him as not really knowing him. She did say that he just got out of jail.

Defense counsel asked to approach the bench, and the trial court excused the jury. Counsel objected that the information was "prejudicial, unfairly prejudicial to our client." Counsel

11

asked that the response be stricken, that a limiting instruction be given, and that a mistrial be granted. The State agreed with the first two requests but not the third. The State pointed to a handful of cases where courts of appeals had held trial courts did not abuse their discretion in finding that similar statements were cured with limiting instructions. Defense counsel responded that this was "incurable error," the defense had no way to explain Garner's "arrest history without waiving any kind of error that they have heard," and the statement would "poison the jury against" Garner "whether he testifies or doesn't testify." The trial court said it would not grant the mistrial but would order the response stricken and give the jury an instruction to disregard the remark. It did.

> Welcome back, ladies and gentlemen. This witness made a statement right before the break that I want you to disregard, that some other witness had said something about possibly this defendant going to jail. The reason, that's hearsay. And the reason we don't allow hearsay in the court is—this is a perfect example—because it's completely unreliable. And so that will be stricken from the record. You're not to—it's irrelevant, and you are not to consider it in any way when considering your verdict.

Contemplating the *Archie*/*Hawkins* factors, we do not find the trial court's refusal to grant the mistrial was an abuse of discretion.

### (1) The magnitude of the prejudicial effect of the remarks

Here, the misconduct was not severe; it was one passing remark by one witness. Additionally, Garner testified and acknowledged he was a felon and could not legally possess a firearm. Garner admitted he had been to the penitentiary for a short period of time for a drug case, back in 2016, when he was seventeen years old.

12

*(2) The efficacy of any cautionary instruction by the judge*

The trial court took prompt measures designed to cure the misconduct—going so far as to tell the jury the hearsay evidence was "completely unreliable" and "irrelevant," and to order the jury "not to consider it in any way." The trial court asked, "Can everybody on the jury do that?" And the jury appears to have agreed that it could because the trial court said, "All right," and instructed the prosecutor to continue direct examination of the witness.

Texas courts, including the Court of Criminal Appeals, have repeatedly held that a witness's brief reference to previous incarceration, absent details about the offense that resulted in incarceration, is cured by an instruction to disregard. *See, e.g.*, *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992) ("this caller also provided information that she had a son named [Kemp] who had recently been released from the penitentiary"); *Gardner v. State*, 730 S.W.2d 675, 696–97 (Tex. Crim. App. 1987) ("[Gardner] told me that even when he was in the penitentiary, that he had stomach problems"); *McBurnett v. State*, 629 S.W.3d 660, 662–64 (Tex. App.—Fort Worth 2021, pet. ref'd) ("I know that I visited [McBurnett] in the Tarrant County Jail— ."); *Smith v. State*, 491 S.W.3d 864, 872-73 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) ("when [Smith] got out of jail that last time that he had went, he kind of stayed at my house"); *Casey v. State*, 349 S.W.3d 825, 835 (Tex. App.—El Paso 2011, pet. ref'd) ("I knew about the previous times that [Casey] was in jail and I was just scared and—"); *Grayson v. State*, 786 S.W.2d 504, 505-06 (Tex. App.—Dallas 1990, no pet.) ("she stated that [Grayson] got out of jail about 5–25–88"). Sergeant Thomas's reference to jail was an isolated, nonresponsive answer and the trial court's instruction to disregard was prompt, occurring immediately after the jury was brought in after the hearing outside its presence. The measures adopted to cure the misconduct sufficed to ameliorate any potential harm.

13

*(3) The strength of the evidence supporting the conviction*

And the evidence supporting the conviction was strong absent the misconduct; again, the crime was for the most part captured on video and shown to the jury. Additionally, three witnesses testified consistently that Allen did not have a gun and that Garner just walked up and shot him.

The trial court did not abuse its discretion in overruling Garner's motion for a mistrial. *See Kemp*, 846 S.W.2d at 308; *Archie*, 221 S.W.3d at 700; *Hawkins*, 135 S.W.3d at 77.

## CONCLUSION

Having overruled Garner's two issues on appeal, we affirm the judgment of the trial court.

_____

Chari L. Kelly, Justice

Before Justices Triana, Kelly and Crump

Affirmed

Filed:   June 3, 2025

Do Not Publish

14