COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| GARRY LEE ATTERBERRY, | § | No. 08-21-00069-CR |
| Appellant, | § | Appeal from the |
| v. | § | 122nd Judicial District Court |
| THE STATE OF TEXAS, | § | of Galveston County, Texas |
| Appellee. | § | (TC# 13CR2852) |

## **O P I N I O N**

A jury convicted Appellant Garry Lee Atterberry of capital murder stemming from a home invasion and robbery.   He challenges the conviction in two issues, arguing that: (1) the trial court erred in denying a motion to suppress that claimed law enforcement seized evidence through a nonconsensual investigative detention unsupported by reasonable suspicion; and (2) the trial court abused its discretion by denying two motions for mistrial.   We affirm the judgment of conviction.[1]

## I.   FACTUAL BACKGROUND

During the early morning hours of October 15, 2013, a 911 dispatcher received a call reporting that a man had been shot inside a home in Galveston, Texas.   Officers arrived at the

---

[1] This case was transferred from our sister court in Houston (14th District), and we decide it in accordance with the precedent of that court to the extent required by TEX.R.APP.P. 41.3.

house and found the 911 caller, Kara Rose, visibly distraught. She reported that two armed men broke into the house, tied her and her boyfriend (Cedric Champion) up with zip ties, stole some items from the house, and fled the scene. As the officers went into the bedroom, they found Champion dead on the floor from multiple gunshot wounds. Rose told police that the men stole her cell phone. The officers then used an application on the phone to track its location. Officers in vehicles began converging on the phone's location, and the phone eventually stopped moving in a residential area. To prevent the suspects from escaping, the police set up a perimeter to stop any vehicle in the area where the phone last pinged (approximately 1.2 miles from Champion's home).

One of the officers setting up the perimeter, Officer Joneka Lundy, parked her patrol vehicle at a nearby intersection. About 45 minutes after Rose's 911 call, Lundy observed a truck driving slowly down a street toward her patrol vehicle. Lundy moved her vehicle so that the truck could pass and she walked up to the truck to contact the driver. When Lundy spoke with the driver, later identified as Appellant, she noticed that he was nervous and sweaty. She also observed that the passenger, co-defendant David Allen, had blood on his wrist. Lundy then ordered Appellant to turn the truck off and radioed for assistance, but Appellant began driving away. Another officer stopped and arrested Appellant along with Allen.

The State charged Appellant with capital murder, alleging that he murdered Champion while committing or attempting to commit the felony offense of robbery. Appellant moved to suppress all the evidence seized through his interaction with Lundy, arguing that (as we explain in greater detail below) the encounter was nonconsensual and that he underwent an investigative detention or arrest without supporting reasonable suspicion or probable cause. The trial court denied the motion by written order.

2

The evidence at trial revealed that before the murder, a group of people were engaged in illicit trafficking of prescription pills. This group included Appellant, Champion, Appellant's friend Toni Coon, and Rose. Rose testified that on the night of the murder, she allowed her six-year-old son to sleep with her and Champion, who was already asleep. Later that night, Rose heard a loud bang as the back door of the house was kicked in, which awakened Champion, Rose, and her son. Two men armed with handguns came into the bedroom and demanded Champion turn over the money and other valuables in the house. The men took Rose's cell phone and tied up her and Champion with zip ties. But Champion managed to free himself and wrestled with one of the men for his gun. During the struggle, Champion bit the man on his arm, which caused the man to start shooting wildly. The other man also began firing at Champion, who was struck by several rounds and collapsed bleeding on the floor. The men took a television from the house and fled. Champion died at the scene. Rose later identified Allen through a photographic lineup as one of the men who committed the murder.

Coon testified that before the murder, Appellant told her that he wanted to "hit some licks" (meaning to commit a robbery) because he had lost his job and wanted pills or money. On the day of the murder, Coon introduced Appellant to Allen. That same day, Coon observed that Appellant and Allen had zip ties, which they planned to use to tie up Champion and Rose while they committed the robbery. Coon also recalled Appellant trying on a black mask and asking her if it concealed his face. Coon saw that Allen had a handgun. Later that night, Appellant and Allen called Coon. They wanted to get each other's numbers because they had become separated right after the murder. During one of these conversations, Appellant told Coon that Allen killed Champion when they fought over the handgun and it discharged during the struggle. Coon also stated that Appellant put a television in his truck during the robbery.

3

The State presented other evidence tending to establish Appellant's guilt that we explain below. The jury found Appellant guilty of capital murder and he received an automatic capital-life sentence as punishment. This appeal follows. In Issue One, Appellant challenges the trial court's order denying his motion to suppress evidence associated with Lundy's traffic stop. Issue Two complains of the trial court's denial of Appellant's motions for mistrial. These motions were based on his claim that: (1) the State introduced prejudicial testimony from Rose and Coon calculated to inflame the minds of the jurors; and (2) in closing argument, the State attacked defense counsel personally, preventing the jury from properly considering Appellant's defensive theory. We consider each issue in turn.

## II. MOTION TO SUPPRESS

### A. Standard of Review

A trial court's ruling on a motion to suppress is reviewed for an abuse of discretion. *State v. Story*, 445 S.W.3d 729, 732 (Tex.Crim.App. 2014). Appellate courts review a trial court's ruling on a motion to suppress under a bifurcated standard. *State v. Arellano*, 600 S.W.3d 53, 57 (Tex.Crim.App. 2020). A trial court's findings of historical fact and determinations of mixed questions of law and fact that turn on credibility and demeanor are afforded almost total deference if they are reasonably supported by the record. *See Sims v. State*, 569 S.W.3d 634, 640 (Tex.Crim.App. 2019). The same deferential standard of review is applied to a trial court's determination of facts that are based on a video recording admitted at the suppression hearing. *See State v. Duran*, 396 S.W.3d 563, 570 (Tex.Crim.App. 2013). Nonetheless, "[w]e review de novo a trial court's determination of legal questions and its application of the law to facts that do not turn upon a determination of witness credibility and demeanor." *Arrellano*, 600 S.W.3d at 57.

When the trial court does not enter findings of fact and conclusions of law, we infer the necessary fact findings that support the trial court's ruling if the evidence in the record (viewed in the light most favorable to the ruling) supports those implied factual findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex.Crim.App. 2008). Thus, the party that prevailed in the trial court "is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Id.*

## B. Law-Enforcement/Citizen Interactions

Interactions between law-enforcement officers and citizens fall into one of three categories: (1) consensual encounters; (2) investigatory detentions; and (3) arrests. *State v. Woodard*, 341 S.W.3d 404, 410-11 (Tex.Crim.App. 2011). Consensual encounters between officers and citizens do not implicate the Fourth Amendment's protections. *Id*. at 411. Officers may stop and question a citizen, and no justification is required for an officer to request information from a citizen. *Id*. But equally so, citizens may terminate a consensual encounter at will. Even if the officer does not tell the citizen that the request for information can be ignored, the citizen's acquiescence to an officer's request need not cause the encounter to lose its consensual nature. *Id*. We consider the totality of the circumstances of the interaction to determine whether a reasonable person in the defendant's position would have felt free to ignore the request or terminate the interaction. *Id*.

Although no bright-line rule establishes when a consensual encounter becomes a seizure, generally when an officer restrains a citizen's liberty through a show of force or authority, the encounter is no longer consensual and it becomes an investigative detention or an arrest. *Id*. An investigative detention is a seizure under the Fourth Amendment that must be supported by reasonable suspicion. *Id.* "Reasonable suspicion to detain a person exists when a police officer

5

has 'specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity.'" *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 36 (Tex.Crim.App. 2017), *quoting Furr v. State*, 499 S.W.3d 872, 878 (Tex.Crim.App. 2016). A reasonable suspicion is more than a mere hunch; the standard requires considerably less proof of wrongdoing than a preponderance of the evidence, and obviously less than is necessary for probable cause. *Garcia v. State*, No 08-19-00176-CR, 2021 WL 235658, at *4 (Tex.App.--El Paso Jan. 25, 2021, no pet.) (not designated for publication), *citing Kansas v. Glover*, 140 S.Ct. 1183, 1187 (2020) (noting that reasonable suspicion falls considerably short of 51% accuracy). When determining whether reasonable suspicion supports an investigative detention, we do not consider the officer's subjective intent in stopping a suspect; rather, we look "solely to whether an objective basis for the stop exists under the totality of the circumstances." *Al-Hanna v. State*, No. 08-17-00037-CR, 2019 WL 156779, at *3 (Tex.App.--El Paso Jan. 10, 2019, no pet.) (not designated for publication), *citing Ford v. State*, 158 S.W.3d 488, 492 (Tex.Crim.App. 2005).

And where there has been a warrantless arrest, an officer must have probable cause to perform the arrest. *Woodard*, 341 S.W.3d at 411.

In a motion to suppress evidence under the Fourth Amendment, the defense bears the initial burden to produce evidence that rebuts the presumption of proper police conduct by showing that the search or seizure occurred without a warrant. *Al-Hanna*, 2019 WL 156779, at *3, *citing Ford*, 158 S.W.3d at 492. Once the defense makes that showing, the burden shifts to the State to prove the reasonableness of the search or seizure. *Id*. In this case, because any purported seizure of Appellant occurred without a warrant, the State carried the burden of establishing the reasonableness of the seizure.

6

## C. Appellant's and Lundy's Interaction

During a hearing on Appellant's motion to suppress, the officer in charge of the investigation at the murder scene, Sergeant Courtney, testified that he saw Champion's bedroom in disarray and Champion lying on the bedroom floor in a pool of blood. Courtney spoke to Rose and learned that she and Champion had been robbed by two armed Hispanic males wearing dark clothing, who fled after they shot Champion and stole items from the house. Rose could not give a description of the suspects' vehicle, and Courtney thought it was possible that the suspects had fled on foot. Courtney first told officers on the radio to stop any Hispanic males wearing dark clothing who were traveling on foot.

After learning that the suspects had stolen Rose's cell phone, Courtney asked Rose to use Champion's cell phone, which was still in the bedroom, to access a cell-phone application called "Find My iPhone". Using the application, Courtney saw that Rose's cell phone began pinging at different locations as the phone's physical location continued to change. Courtney told officers over the radio that he did not have a description of the suspects' vehicle or know if they were traveling by vehicle or on foot, but that the officers should start moving toward the area in which Rose's cell phone was moving. Later, the cell phone's location stopped moving and Courtney ordered officers to converge on that area. Courtney also began ordering officers to set up an inner perimeter around the address where the cell phone stopped, as well as an outer perimeter at specific locations around the address to protect the neighborhood and prevent suspicious pedestrians and vehicles from leaving the area. Courtney ordered the officers to stop anyone who looked suspicious.

Courtney ordered one of those officers, Lundy, to set up at a specific intersection. During the suppression hearing, Lundy testified that she had been an officer with the Galveston Police

7

Department for ten years. At 1:14 a.m., Lundy received a dispatch about a home invasion in which one person had been shot and that two Hispanic males had fled the scene, so she started driving toward Champion's house. After arriving in the neighborhood, Lundy continued driving west of Champion's house as she received updates about the cell phone's changing pinging location. Lundy observed "[v]ery light" vehicular traffic in the area that night. Lundy changed positions several times before she eventually arrived at her final assigned location. Once there, she parked her vehicle on the street corner with the headlights on and began searching for the two Hispanic males. A dashcam video from Lundy's patrol vehicle shows that her vehicle was partially blocking the intersection, but there was enough clearance for another patrol vehicle to pass through the intersection without interference. Lundy later moved the vehicle further into the intersection, but there still appeared to be a space wide enough for another vehicle to pass between Lundy's vehicle and the curb.

At 2:01 a.m., a white truck with two males inside approached the intersection from the direction of the target area. The truck moved slowly toward the intersection, so Lundy walked up to the truck and the truck slowed down and eventually stopped when it reached Lundy. Lundy asked the driver, later identified as Appellant, where he lived and where he was going. Appellant was "very evasive" in his responses. Further, he gave an area based on a restaurant's location in response to the question about where he lived, which struck Lundy as unusual. Both occupants of the truck were "very nervous and sweating profusely." Pointing her flashlight at the occupants, Lundy saw that the passenger, co-defendant Allen, had blood on his wrist. Lundy told Appellant to turn the truck's engine off. Lundy then radioed that she had two men in a truck and that one of them had blood on his wrist. She requested additional units to respond to her location and ordered the occupants in a loud voice to put their hands out of the truck. However, Appellant restarted

8

the truck and attempted to drive away before another officer stopped the truck by running in front of it with his weapon drawn. Appellant and Allen were arrested for evading arrest or detention.

Following the hearings on the motion to suppress, the trial court denied Appellant's motion by written order. Although Appellant requested associated findings of fact and conclusions of law, none were entered.[2] Appellant filed a "Motion to Re-Open Motion to Suppress," but it does not appear that the trial court ruled on the motion. Appellant also re-urged his motion to suppress following the close of evidence during the guilt-innocence phase of the trial, and the trial court again denied the motion.

### D. Lundy's First Interaction with Appellant was a Consensual Encounter

On appeal, Appellant argues that the interaction between himself and Lundy was not consensual, but that Lundy subjected him to an investigative detention unsupported by reasonable suspicion. He contends that Lundy's actions restricted his freedom of movement to the degree associated with an investigative detention, arguing that although Lundy did not physically block Appellant's freedom of movement, she still subjected him to a detention by jumping out of her vehicle and approaching his truck with her flashlight activated. Appellant also points to Lundy's testimony that she would have had him stopped if he had not voluntarily done so, as well as her belief that it "would have been strange if he would have kept going" after she initiated contact with Appellant.

First, we note that both Appellant's subjective feeling about the encounter and Lundy's subjective intent in initiating the encounter are both irrelevant in our analysis; rather, courts employ an objective test to decide whether an interaction is a consensual encounter or a seizure under the Fourth Amendment. *See Wade v. State*, 422 S.W.3d 661, 669 (Tex.Crim.App. 2013). Thus, we

---

[2] On appeal, Appellant does not complain that the trial court erred by failing to enter findings of fact and conclusions of law in response to his written request.

9

disregard what Lundy was thinking and focus solely on what she said and did during the encounter.

The United States Supreme Court has identified several factors that distinguish investigative detentions from consensual encounters, including:  (1) the threatening presence of multiple officers; (2) the display of a weapon by an officer; (3) the physical touching of the citizen's person; and (4) the use of language or tone of voice suggesting that compliance with the officer's request might be compelled.  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Crain v. State*, 315 S.W.3d 43, 49-50 (Tex.Crim.App. 2010) (recognizing the *Mendenhall* factors).  We also look to the surrounding circumstances, including the time and place of the interaction, "but the officer's conduct is the most important factor when deciding whether an interaction was consensual or a Fourth Amendment seizure."  *Woodard*, 341 S.W.3d at 411; *see also Crain*, 315 S.W.3d at 50 (underscoring the officer's use of language and tone of voice in determining whether an encounter was consensual).

Under the totality of the circumstances, we find that the initial interaction between Appellant and Lundy was a consensual encounter, and not an investigative detention or arrest. The record shows that during her initial encounter with Appellant, Lundy was alone, did not draw her weapon, and did not physically touch Appellant.  The dashcam video shows that Lundy did not block the street with her patrol vehicle to extent that Appellant could not have passed in his vehicle. Lundy did not use her spotlight or the emergency lights on her vehicle to stop Appellant. At no point during the interaction did Lundy say that Appellant was not free to leave or order him to exit the vehicle.  Importantly, Lundy did not raise her voice while speaking to Appellant nor speak to him in a threatening manner.  She limited her questions to neutral inquiries about where Appellant was going and where he lived.  *See Garcia-Cantu*, 253 S.W.3d at 248 (recognizing that when determining whether an encounter is consensual, "much depends upon the [officer's] tone

10

and level of voice, as well as the [officer's] demeanor," and further recognizing that a "neutral inquiry" is less likely to convert an encounter into a seizure). These facts strongly suggest that the interaction up to that point was consensual. *See Woodard*, 341 S.W.3d at 412-13 (an officer-suspect encounter was consensual where the officer, who had a description of the suspect, stopped the suspect and asked him if he had been involved in an accident); *Stewart v. State*, 603 S.W.2d 861, 862 (Tex.Crim.App. [Panel Op.] 1980) (holding that an officer-citizen encounter did not implicate the Fourth Amendment where the officer shined his flashlight at a van and walked toward it, and where the officer did not exercise any authority over the defendant until after he smelled burning marijuana coming from the van); *Johnson v. State*, No. 08-99-00020-CR, 2000 WL 1060641, at *2 (Tex.App.--El Paso Aug. 3, 2000, no pet.) (not designated for publication) (holding that an officer-citizen interaction was a voluntary encounter where the officer did not tell the suspect that she was free to leave, the officer asked for the suspect's identification, and the suspect consented to empty her pockets and take off her shoes).

We also consider whether Lundy's request that Appellant turn his truck off was a show of authority that required Appellant's compliance. Audio from the dashcam video in Lundy's patrol vehicle shows that Lundy told Appellant, "Turn your truck off for me," and Appellant replied, "No problem." Lundy's request occurred late at night on a deserted street and she pointed her flashlight at Appellant; all of these facts favor the encounter being a seizure. *See State v. Castleberry*, 332 S.W.3d 460, 468 (Tex.Crim.App. 2011) (noting that a reasonable person would feel more obligated to comply with a police request late at night in a deserted area); *Garcia-Cantu*, 253 S.W.3d at 249 (stating that an officer's pointing of a flashlight at the defendant's vehicle and face supported an encounter being nonconsensual).

The dashcam video, however, did not capture the interaction between Lundy and Appellant

while they were speaking, and it is unclear just from the video whether Lundy saw the blood on the passenger's wrist before or after she ordered Appellant to turn the truck off. A review of the audio from the dashcam video, however, shows that Lundy asked Appellant to turn off the truck and then immediately reported on the radio that one of the occupants of the truck had blood on his wrist. Our standard of review requires us to infer all facts necessary that are supported by the evidence to sustain the trial court's order. *See Garcia-Cantu*, 253 S.W.3d at 241. We thus presume that Lundy only ordered Appellant to shut the car off *after* she saw the blood on Allen's wrist. Viewed in that light, the interaction became an investigatory detention after that point, the justification for which we address below.

There are no bright-line, per se rules that determine whether any specific officer-citizen encounter amounts to a Fourth-Amendment detention, and we must consider the totality of the circumstances in determining whether a suspect was seized. *Castleberry*, 332 S.W.3d at 466-67. Bearing this in mind, the initial interaction between Lundy and Appellant was consensual, especially given Lundy's calm and non-coercive demeanor. Under these facts, the trial court's implied conclusion that Appellant's interaction with Lundy was consensual falls within the zone of reasonable disagreement.

### E. The Investigative Detention was Supported by Reasonable Suspicion

We also find that Lundy had sufficient reasonable suspicion to temporarily detain Appellant from the time Lundy ordered him to turn off the truck. At the time of the encounter, Lundy had knowledge that a murder had taken place, the suspects were two men on foot or in a vehicle, and a cell phone they had stolen had stopped moving in an area approximately one mile away from the murder scene. According to Lundy, traffic at that late time of night was "very light," and Appellant's vehicle was the only one to approach from the area of the neighborhood

12

where the cell phone had stopped moving. There were only two points of entry by road into the neighborhood. Before contacting Appellant, Lundy observed that the vehicle approached her "very slowly" with two male occupants inside. After seeing that the passenger had blood on his wrist, Lundy told Appellant to shut the truck off and used her radio to report that she "had two Hispanic males, one with blood on his wrist." She then ordered Appellant and the passenger to place their hands outside the truck's windows.[3]

Appellant argues that the only facts Lundy articulated as the basis for the stop was Appellant's slow driving and the direction from which Appellant approached the intersection. It is true that courts have held that driving slowly, without more, provides an insufficient basis to conduct a traffic stop. *See, e.g.*, *Richardson v. State*, 39 S.W.3d 634, 640 (Tex.App.--Amarillo 2000, no pet.). That said, Appellant's argument fails for two reasons. First, Lundy's subjective reasons for stopping Appellant are irrelevant and we only consider whether, based on the totality of the circumstances, there was an objective basis for the stop. *Al-Hanna*, 2019 WL 156779, at *3. Second, Appellant's slow driving was not the only fact that tended to establish that Appellant had recently engaged in criminal activity. In particular, Lundy's observation of Appellant's nervous and sweaty demeanor, his odd answer to where he lived, as well as the blood on Allen's wrist, constitute evidence consistent with Appellant's involvement in a shooting murder—the very crime Lundy was assigned to investigate.

Given the totality of the circumstances, and viewing the evidence in the light most favorable to the trial court's denial of the motion to suppress, we hold that Lundy had sufficient reasonable suspicion to justify an investigative detention of Appellant, and the trial court did not

---

[3] Lundy and the arresting officer also had probable cause to arrest Appellant for evading arrest or detention once he fled the scene given that Lundy ordered him to place his hands outside the window. *See* TEX.PENAL CODE ANN. § 38.04(a) ("A person commits an offense if he intentionally flees from a person he knows is a peace officer or federal special investigator attempting lawfully to arrest or detain him.").

13

abuse its discretion by denying the motion. *See, e.g.*, *Childs v. State*, No. 05-01-01863-CR, 2003 WL 67980, at *1 (Tex.App.--Dallas Jan. 9, 2003, no pet.) (mem. op., not designated for publication) (where police officer stopped vehicle that had blood smeared on the trunk, officer had reasonable suspicion to believe that "criminal activity might be afoot," which justified detaining defendant and searching his car); *Jeffrey v. State*, No. 03-01-00202-CR, 2002 WL 570715, at *5 (Tex.App.--Austin Apr. 18, 2002, no pet.) (not designated for publication) (holding that officers had reasonable suspicion to detain a suspect in an alley where the suspect gave an implausible reason for his presence in the alley, exhibited a nervous demeanor, and had fresh blood on his pants).

Appellant's Issue One is overruled.

### III. MOTIONS FOR MISTRIAL

#### A. Standard of Review and Applicable Law

In his second issue, Appellant challenges the trial court's denial of two motions for mistrial. We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Archie v. State*, 221 S.W.3d 695, 699 (Tex.Crim.App. 2007). We must uphold the trial court's ruling on a motion for mistrial if the decision was within the zone of reasonable disagreement. *Id.*

A mistrial is an appropriate remedy in "extreme circumstances" for a narrow class of highly prejudicial and incurable errors. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex.Crim.App. 2009), *quoting Hawkins v. State*, 135 S.W.3d 72, 77 (Tex.Crim.App. 2004). A mistrial halts trial proceedings when an error is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Id.* Because it is an extreme remedy, a mistrial should only be granted "where the [conduct] was clearly calculated to inflame the minds of the jury or was of such damning character as to suggest it would be impossible to remove the harmful impression from

the jurors' minds," even if the trial court employed curative measures. *Young v. State*, 283 S.W.3d 854, 878 (Tex.Crim.App. 2009), *quoting Rojas v. State*, 986 S.W.2d 241, 250 (Tex.Crim.App. 1998); *see also Ocon*, 284 S.W.3d at 884-85.

We review a trial court's denial of a motion for mistrial by balancing these factors: (1) the severity of the misconduct (i.e., the degree of the prejudicial effect); (2) the effectiveness of the curative measures taken; and (3) the certainty of the conviction or the punishment assessed without the misconduct. *Ramirez v. State*, No. 08-15-00090-CR, 2017 WL 769881, at *5 (Tex.App.--El Paso Feb. 28, 2017, no pet.) (not designated for publication), *citing Hawkins*, 135 S.W.3d at 77; *see also Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App. 1998) (setting forth the above factors commonly referred to as the Mosley factors). As to the second factor, we generally presume that juries duly follow a trial court's instruction to disregard and other cautionary measures, and a defendant must point to specific evidence that the jury failed to follow the trial court's instructions. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex.Crim.App. 2005).

### B. Coon's and Rose's Testimony

Appellant first complains that the trial court should have granted his motion for mistrial in response to Coon's and Rose's testimony about Appellant's and the other parties' pre-murder involvement in narcotics trafficking. The topic of the testimony was the subject of Appellant's motion in limine, to which the parties agreed that "some discussion that the pills being involved would come up." The trial court granted the motion.

During the guilt-innocence phase of trial, the State asked Coon about whether Appellant was arrested when the police arrested her (Coon) several weeks before the murder. Coon answered, "[Appellant] had been arrested before from my house, yes." Defense counsel objected that Coon's testimony was nonresponsive to the State's question and that she had injected that

15

Appellant had a criminal history. Defense counsel asked both for an instruction to disregard the testimony and a mistrial. The trial court sustained the objection and issued an instruction to disregard, ordering the jury to not consider Coon's testimony for any purpose. The court denied the motion for mistrial.

Later in the trial, Rose testified that several days before the murder, Appellant came to her house looking for Champion. When the prosecutor asked Rose if she talked to Appellant, Rose testified that she told Appellant that Champion was not home and asked him to not come by her house unannounced. She added that Appellant "was messed up on pills or whatever he was on." Defense counsel objected that this latter testimony violated the motion in limine. The trial court ordered the jury to disregard the State's question and Rose's answer. The prosecutor next asked Rose if her conversation with Appellant was unpleasant, and she agreed, adding that Appellant "cussed [her] out." Defense counsel objected that this testimony violated the motion in limine's coverage of certain extraneous-offense evidence, and the trial court again sustained the objection and ordered the jury to disregard the testimony.

### 1. Severity of the misconduct

On appeal, Appellant contends that the prosecutor's questions were calculated to inflame the minds of the jurors and could not be cured by an instruction to disregard. In particular, he claims that the prosecutor's question, "Was [Appellant] arrested?" elicited prejudicial extraneous-offense testimony from Coon that "[Appellant] had been arrested before from my house, yes." The State concedes that Coon's testimony was non-responsive to the prosecutor's question and that it was unclear whether Coon was referring to an unknown number of prior arrests or if she was inarticulate in how she answered the prosecutor's question. Nevertheless, we conclude that, given the context of the prosecutor's line of questioning about a particular incident that occurred

16

several weeks before the murder, the prosecutor's question was not intended to elicit testimony that would have violated the motion in limine. Nor did the State emphasize the testimony in its arguments. Thus, we find that the misconduct, if any, was not severe and this factor supports the trial court's denial of the motion for mistrial.

Appellant also complains about Rose's testimony that Appellant appeared to be under the influence of narcotics when he came to her house and cursed at her. Appellant argues that the testimony created an impression with the jury that he was a drug user and was hostile to Rose and Champion. The State again concedes that Rose's testimony was not responsive to the prosecutor's question. Even so, neither of these questions were intended to elicit testimony from Rose that violated the motion in limine, and the record suggests that Rose simply offered her recollections on matters that were not responsive to the prosecutor's questions. And again, the State did not emphasize the testimony.

We find that any misconduct was not severe enough to render the trial court's denial of the mistrial to be out of the zone of reasonable disagreement. *See Wells v. State*, 558 S.W.3d 661, 670 (Tex.App.--Fort Worth 2017, pet. ref'd) (holding that a brief, unsolicited comment on the defendant's drug use was not extreme enough to cause uncurable prejudice); *Jackson v. State*, 495 S.W.3d 398, 420 (Tex.App.--Houston [14th Dist.] 2016, pet. ref'd) (holding that a brief reference to the defendant's prior criminal history was not calculated to inflame the minds of the jury).

### 2. *Curative measures*

Next, we consider the trial court's curative measures in response to the alleged misconduct. Appellant objected to both Coon's and Rose's testimony and requested instructions to disregard, which in both cases the trial court promptly issued. Appellant argues that the trial court's instruction to disregard Coon's testimony was too confusing to be effective. The court's

17

instruction stated:

> Ladies and gentlemen, there may have been a question asked regarding arrests of the defendant other than the incident in question of when she and the others were arrested. CC was arrested on, I think, October 4th. So, disregard that question and that answer. Do not consider that for any purpose.

Although the court's instruction did not specifically tell the jury to disregard any implication that Appellant had been previously arrested more than once, the instruction did order the jury to disregard the State's question and Coon's testimony and not consider that evidence for any purpose. Further, Appellant did not complain in the trial court that the instruction was ineffective. We find that the instruction was clear enough to be effective.

Moreover, the substance of Coon's and Rose's testimony was not so inflammatory that instructions to disregard would have been ineffective. The jury heard unobjected-to testimony from a detective that Appellant had been arrested for possession of narcotics. Thus evidence of Appellant's prior criminal history and association with narcotics was already before the jury. And in any case, Appellant points to no evidence rebutting the presumption that the jury failed to follow the trial court's instructions. *See Thrift*, 176 S.W.3d at 224 (a defendant must point to specific evidence that a jury failed to follow a trial court's instruction to disregard evidence).

Thus, we presume that the jury followed the trial court's instructions to disregard, and the second *Mosley* factor also favors the trial court's decision. *See Ladd v. State*, 3 S.W.3d 547, 571 (Tex.Crim.App. 1999) (holding that a trial court's instruction to disregard the defendant's multiple prior arrests was effective to cure any prejudicial effect); *Smith v. State*, 491 S.W.3d 864, 873 (Tex.App.--Houston [14th Dist.] 2016, pet. ref'd) (holding that a trial court did not abuse its discretion by denying a motion for mistrial when the court issued an instruction to disregard a reference to the defendant's prior incarceration, and where the elicitation of the testimony was not calculated to inflame the minds of the jurors).

### 3. Certainty of conviction

Finally, we consider the certainty of the conviction without the misconduct. Here, the record strongly supports Appellant's guilt. As detailed above, the jury heard evidence that officers arrested Appellant and Allen approximately one mile away from the murder scene after they tried to flee from an officer who saw blood on Allen's wrist. Appellant's attempted flight is consciousness-of-guilt evidence that tends to establish his culpability. *See, e.g.*, *Liller v. State*, No. 08-16-00309-CR, 2018 WL 3583877, at *5 (Tex.App.--El Paso July 26, 2018, pet. ref'd) (not designated for publication) (stating that a defendant's flight from a murder scene suggests his consciousness-of-guilt and serves as evidence that the defendant committed the charged offense).

The State also presented other evidence tending to directly establish Appellant's guilt, including: (1) Appellant had gunshot residue on his hands, which pointed to him recently firing a weapon; (2) officers recovered pieces of gloves from the crime scene, several of which yielded DNA samples from which Appellant could either not be excluded or was a likely contributor; (3) Appellant's cell phone records showed that he repeatedly called Coon between 9:30 p.m. and 1:50 a.m. (and a lack of communication between 12:41 a.m. and 1:13 a.m., the approximate time frame Champion was killed); and (4) Rose's testimony that she heard Appellant plotting with Allen to commit the murder because he had lost his job and wanted pills or money.

The testimony suggesting that Appellant had been arrested and used narcotics was not prejudicial enough to have possibly overridden the strong evidence establishing Appellant's guilt. Thus, we are convinced that any prejudicial effect from Coon's and Rose's testimony did not contribute to Appellant's conviction, and the third *Mosley* factor also favors the trial court's rulings. *See Ramirez*, 2017 WL 769881, at *6 (holding that the third *Mosley* factor warranted affirming the trial court's denial of a motion for mistrial where the evidence was not so close that

19

the complained of testimony might have tipped the scale in favor of the conviction, especially considering the trial court's instruction to disregard).

In sum, all three factors support the trial court's denials of Appellant's motions for mistrial associated with Coon's and Rose's testimony, and we hold that the trial court did not abuse its discretion by failing to grant a mistrial.

### C. Prosecutor's Closing Arguments

Appellant also complains that the trial court abused its discretion by denying his motion for mistrial made in response to the prosecutor's closing argument. During closing argument, defense counsel argued that although Allen killed Champion, the evidence did not establish Appellant's identity as the second shooter because there was an unknown person's DNA on one of the recovered glove fragments from Champion's bed that could have come from a large number of unknown persons. Defense counsel contended that the "real question is: What is the likelihood of finding the partial DNA profile [that the DNA analyst] found on the glove?" Pointing to the DNA analyst's testimony on the likelihood that the DNA profile on the glove came from Appellant, defense counsel posited that ten to fifteen people in Galveston County or several hundred people in the Houston area could have contributed to the DNA profile found on the glove fragment.

During rebuttal argument, the prosecutor began arguing: "So, when the defense attorney wants to get up there and play around with the numbers . . . ." Defense counsel objected that the prosecutor was striking at Appellant over defense counsel's shoulders and that the defense did not have the burden of proof. The prosecutor responded that he would rephrase, and the trial court ordered the jury to disregard the prosecutor's argument and only consider the evidence and the jury charge. Defense counsel moved for a mistrial, and the trial court denied the motion. The prosecutor then moved on to other matters and did not make the argument again.

20

*1. Severity of the misconduct*

The Texas Court of Criminal Appeals has recognized four proper areas of jury argument: (1) summation of the evidence presented at trial; (2) reasonable deductions drawn from that evidence; (3) answers to opposing counsel's argument; and (4) pleas for law enforcement. *Jackson v. State*, 17 S.W.3d 664, 673 (Tex.Crim.App. 2000). Argument that exceeds the permissible bounds of these approved areas "will not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex.Crim.App. 2000). When examining a challenge to a jury argument, we consider the argument in the context in which it appears. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex.Crim.App. 1988).

Appellant argues that the prosecutor's argument that defense counsel "want[ed] to get up there and play around with the [DNA] numbers" constituted an inappropriate personal argument about defense counsel rather than the merits of the case. *See Mosley*, 983 S.W.2d at 259 ("a prosecutor runs a risk of improperly striking at a defendant over the shoulder of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character"). The State responds that the prosecutor's argument did not attack defense counsel personally but constituted a response to defense counsel's argument that the statistical probabilities associated with Appellant's contribution to the DNA sample on the glove were not as incriminating as the State made them out to be.

We agree with the State that although the prosecutor's argument was directed at defense counsel, when considered in context, it responded to defense counsel's argument for the unpersuasive nature of the DNA evidence. Because responses to opposing counsel's argument

21

are one of the permissible areas of jury argument, we hold that the misconduct, if any, was not severe and that the first *Mosley* factor favors the trial court's decision to deny the mistrial. *See Garcia v. State*, 126 S.W.3d 921, 925 (Tex.Crim.App. 2004) (holding that a prosecutor's statement that defense counsel's arguments were "hogwash" was not improper because the comment was directed at defense counsel's theories and arguments in the case); *Acosta v. State*, 411 S.W.3d 76, 93 (Tex.App.--Houston [1st Dist.] 2013, no pet.) (holding that a prosecutor's argument that defense counsel's argument "was just words from the defense attorney's mouth" did not constitute an inappropriate strike at the defendant over counsel's shoulders, but was rather a response to defense counsel's argument).

### 2. *Curative measures*

Just after defense counsel objected to the argument, the prosecutor stated that he would rephrase his argument and the trial court ordered the jury to disregard the argument and consider only the evidence and the jury charge. The State then moved on to other matters and did not make the argument again. Although Appellant argues that the prosecutor's conduct "was so extreme that it could not be cured by an instruction to disregard," he points to no evidence that the jury failed to obey the court's instruction. As a result, we presume that the instruction to disregard was effective, and the second *Mosley* factor supports the denial of the mistrial. *See Thrift*, 176 S.W.3d at 224 (a defendant must point to specific evidence that a jury failed to follow a trial court's instruction to disregard evidence).

### 3. *Certainty of conviction*

For the reasons set forth above, we again note that the evidence was strong, even without considering the DNA evidence. The State established Appellant's identity through other means, including Rose's testimony about Appellant's planning of the murder and the presence of gunshot

residue on his hands. These facts, combined with the other evidence of Appellant's guilt set forth above, demonstrate that Appellant was not convicted because the prosecutor accused defense counsel of misrepresenting the statistical probabilities associated with the presence of Appellant's DNA on the glove fragment. Thus, the third *Mosley* factor favors the trial court's decision. *See Pena v. State*, 554 S.W.3d 242, 252 (Tex.App.--Houston [14th Dist.] 2018, pet. ref'd) (holding that a prosecutor's closing argument that purportedly struck at the defendant over defense counsel's shoulder did not warrant a mistrial where the trial court issued an instruction to disregard the argument and strong evidence supported the certainty of the defendant's conviction without the argument).

In sum, all three *Mosley* factors support the trial court's denial of Appellant's motion for mistrial associated with the State's closing argument, and we hold that the trial court did not abuse its discretion by denying the motion.

Appellant's Issue Two is overruled.

## IV. CONCLUSION

The trial court's judgment of conviction is affirmed.

JEFF ALLEY, Justice

August 22, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)

23