**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00007-CR**
_____

**JOSE HORACIO HERNANDEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 21-04-05217-CR**

**MEMORANDUM OPINION**

A jury found Jose Horacio Hernandez (Appellant) guilty of the offense of continuous sexual abuse of a child. *See* Tex. Penal Code Ann. § 21.02(b). Appellant elected for the trial court to determine punishment. After hearing punishment evidence, the trial court sentenced Appellant to fifty years of confinement. On appeal, Appellant raises three issues, challenging the denial of a motion for mistrial, the denial of his motion for directed verdict, and the legal sufficiency of the evidence to support his conviction. We affirm the trial court's judgment.

1

Evidence at Trial

Testimony of Norma Carmona

Norma Carmona, a forensic interviewer with Children's Safe Harbor children's advocacy center, testified. According to Carmona, she has conducted 2,869 forensic interviews of children about abuse and crimes throughout her career, and she conducted a recorded interview of R.H.[1] on April 28, 2020. Carmona testified that when she spoke with R.H., R.H. understood the difference between the truth and a lie, maintained eye contact, gave sensory details about how the assaults made her feel physically and emotionally, and described specific details about items in the room and things her father would do or say during the instances when he sexually abused her. Carmona testified that, based on her training and experience, abuse can occur while others are also in the home, and she has had cases where biological parents sexually abused their children over years.

Carmona interviewed R.H. and R.H. said she was raped by her father. During the interview R.H. reported that one of the first instances of the abuse by her father that she could remember was when she was eleven years old and living at her father's

---

[1] We use initials to refer to the alleged victim and her mother. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

house, and he took her clothes off and put his "private part" in her "private part." R.H. told Carmona that it hurt her and that she went to the bathroom and cleaned herself off. Carmona clarified with R.H. that when R.H. referred to "private parts" she meant vagina and penis. R.H. gave details to Carmona about the timeframe of the assault and the assault itself.

R.H. told her about a time when her mother and brother had gone to the store to get Oreos and milk, R.H. was in her mother's bedroom, and her father walked in and made R.H. put her mouth on his "private part." R.H. told Carmona that R.H.'s father would sexually assault her often and that the only time it would not happen was "when she was on her cycle and when at her grandparents['] house."

Carmona testified that R.H. told her that the most recent abuse happened about a month before the interview when R.H. was fourteen. R.H. told Carmona that R.H. was on the couch at her father's house and her father kissed her neck, took her shirt, bra, and sweatpants off, and put his mouth on her breasts and "private part," put his hand on her breasts, and put his "private part" in her "private part." She told Carmona that she felt vulnerable while it was happening.

Testimony of Detective Chantel Ward

Chantel Ward, a detective with the Montgomery County Sheriff's Office, testified that the case was reported to law enforcement on April 22, 2020. Detective Ward testified that typically after a child makes an outcry of abuse, the child is

3

interviewed by a trained forensic interviewer, the child undergoes an examination by a sexual assault nurse examiner (SANE), and law enforcement investigates to corroborate the child's outcry. Detective Ward testified that if 120 hours have passed since contact with the perpetrator, the SANE will do a nonacute examination and not collect DNA evidence.

Detective Ward testified that at the time of the report to law enforcement of R.H.'s outcry, Detective Ward's primary concern was R.H.'s safety, and Detective Ward confirmed when the claim of abuse was reported, R.H. was living with other family members, away from Appellant. Detective Ward testified that she attended R.H.'s forensic interview and that R.H. was "very guarded[]" and "very emotional" during the interview. Detective Ward testified that R.H. was able to give details, including sensory details, about the assaults and how they occurred. According to Ward, she understood that R.H. reported the sexual abuse by her father that had occurred from about 2017 to 2020, when R.H. was eleven years old to fourteen years old, and R.H. reported that the abuse occurred in R.H.'s home. Detective Ward testified that R.H.'s brother also was brought in for a forensic interview because he was in the same household, but R.H.'s brother made no disclosure and had no knowledge related to the case. Due to the passage of time since the last assault, R.H. underwent a nonacute SANE exam and during the exam R.H. made a disclosure consistent with her disclosure during the forensic interview. Detective Ward testified

4

that the consistency of R.H.'s disclosures from her initial outcry, forensic interview, and SANE exam helped Ward corroborate and verify information provided by R.H.

Detective Ward testified that she spoke to D.H., R.H.'s mother, several times during the case. According to Ward, initially D.H. was helpful with the case, was very upset because the outcry was made to her, wanted to take care of her child, could not believe that the abuse had happened "right under her nose[,]" and feared that Appellant would flee because of R.H.'s accusations. Detective Ward testified that over time, D.H. "thought the case would move forward a lot quicker[,]" and felt like "she was playing the middleman between her husband and her daughter." Ward testified that although her report stated that D.H. indicated to her that D.H. and Appellant had "sex all over the house," including in the children's bedrooms, when Ward clarified and asked D.H. specifically about whether she and Appellant had sex in R.H.'s room, D.H. relied, "No[,]" and said they would have sex in their son's room because it had an air conditioner.

Detective Ward and Investigator Lance Holden searched the residence where R.H. reported the abuse had occurred. A sample was taken off R.H.'s bedding. According to Detective Ward, the DNA results did not come back on the bedding until after Hernandez was arrested, and the results confirmed Ward's suspicion that they would find Hernandez's bodily fluids on R.H.'s bedding. Detective Ward subpoenaed R.H.'s school records because it was Ward's understanding that

5

Hernandez had been withholding her from school, and the school records showed the number of R.H.'s absences increased in 2018 and 2019. Detective Ward interviewed Hernandez with the help of another detective because of a language barrier, and Hernandez was cooperative, denied the sexual assaults, and voluntarily submitted to DNA testing and a blood draw. Just prior to Hernandez's arrest, Ward learned that D.H. and R.H. had moved back in with Hernandez, which Detective Ward believed put R.H. at risk. According to Detective Ward, based on R.H.'s ability to articulate the manner and means and timeline of the assaults by Hernandez, Ward arrested Hernandez in April of 2021 for continuous sexual abuse of a child.

R.H.'s Testimony

R.H. testified that she was seventeen years old at the time of trial. She stated that in 2019 she was living with her mother, father, and younger brother. According to R.H., before she was ten years old, she and her father were close. R.H. testified that things changed when she was eleven, and they began to argue and he would shame her about her weight and appearance, call her names, physically fight with her, and sexually assault her. R.H. testified that she knew she was eleven when the sexual assaults started because they started around the time that her father's brother had passed away and her father's drinking had gone from a "12-pack in a couple of days to drinking a 24-pack a day." She also knew that the sexual assaults "had already been going on for a while[]" before she first started menstruation at age

6

thirteen. R.H. testified that, initially, Appellant would "touch [her] private parts where [she] pee[d] from or [her] breasts[,]" and this happened more than one time. R.H. testified that, before her outcry to her mother, R.H. felt alone, was depressed, and when her father would shame her or assault her, she would even engage in "self-harm."

About two weeks after the last time Appellant sexually assaulted R.H., when she was at her grandparents, R.H. told her mother about the abuse. R.H. testified that a couple of days before she told her mother, her mother had told R.H. that she had been raped by a former boyfriend when she was younger. R.H. testified that this conversation prompted her to tell her mother what had been happening with her father because she felt like her mother would believe her based on what had happened to her mother. According to R.H., her mother was the first person she told about the abuse, R.H. felt "[f]ree[]" and not alone after she told her mother, and her mother "took off[]" upset and called the police. R.H. wanted her mother to call the police, and she told her mother about the abuse because she wanted freedom from her father and to "get justice" for what he had done to her because it was not right. R.H. testified that she is traumatized by flashbacks of the abuse, and the abuse has caused her to have anxiety attacks and has affected her eating and sleeping habits. She testified that during the investigation, she moved back home but kept her distance from her father, and he tried to act like a "normal father." According to

7

R.H., she did not lie about the abuse, and that if she just wanted to get back at her father, she could have called the police back when he physically abused her mother.

R.H. testified that the last time Appellant assaulted her she was at home, her brother and mother had gone to the store, R.H. and Appellant were in the living room, he pinned her against the window, grabbed her and put her on the couch, kissed her, took her clothes off, and put his private in her private. She explained that he ejaculated on her stomach, and that during the assault she was thinking "[t]hat what he was doing wasn't okay" and she was scared. According to R.H., Appellant had put his private into her private from the time she was eleven until she was fourteen, that he also touched her breasts with his hand, that he touched her private part with his mouth once and with his hand on multiple occasions, that he made her put her hand on his private part one time and her mouth on his private part multiple times, that the sexual assaults happened daily and sometimes two or three times in a day, and that for a long time she just accepted the assaults as just a normal part of her childhood. R.H. testified that Appellant often would try to separate her from her mother and brother, and Appellant would keep R.H. home from school and call her mother to say R.H. was sick when she was not, which upset R.H. He would also sexually assault her after her mother and brother had gone to sleep at night. R.H. recalled that on one occasion after the assaults began, her father told her that if she

8

ever told her mother about it, her mother would not believe R.H. According to R.H. this made her scared and doubt whether anyone or her mother would believe her.

D.H.'s Testimony

D.H., R.H.'s mother, married Hernandez in 2005, about a month after R.H. was born, and they moved into their current home in 2006. According to D.H., R.H. was a happy but "very shy, very quiet[]" child when she was growing up, and she started to become more quiet around ten or eleven years old. Before R.H. was ten years old, R.H. was a "daddy's girl[]" and liked to always be around her father who spoiled her, but their relationship changed. D.H. was unaware at the time that there was an inappropriate sexual relationship between R.H. and Appellant, but at the time of trial she could now see "red flags" that she has since thought about. For instance, R.H. and Hernandez began to argue, and when D.H. and Hernandez would argue, R.H. would intercede to protect her mother. In the years leading up to R.H.'s outcry, D.H. did not notice R.H.'s self-harm, but at the time of trial was aware that R.H. was self-harming during that time. D.H. testified that during the years leading up to R.H.'s outcry, D.H. and Hernandez's relationship had "more bad than good[]" days, and D.H. and Hernandez's sex life got to the point it "wasn't active[.]" According to D.H., she and Hernandez had sex mainly in their bedroom, did not have sex in R.H.'s bedroom, but did have sex in their son's bedroom because there was air conditioning there, which she told the detectives during their investigation. D.H.

9

testified that when R.H. was fourteen, leading up to the time of her outcry, R.H. was bullied at school, was struggling with schoolwork, and had a problem with absences.

At the time of R.H.'s outcry, D.H. and the children were visiting D.H.'s parents and stayed there because D.H.'s brother had suffered a heart attack and D.H. was trying to help with his recovery, and R.H. could attend a different school during the school year. D.H. testified that during this time she was back and forth between her house and her parents' house. According to D.H., one day she had a conversation with R.H. about sex, and D.H. shared with R.H. that D.H. had been raped. D.H. testified that R.H. "stayed quiet[]" during the conversation, but a month or two later, pulled D.H. into a room at D.H.'s parents' house and started crying and told D.H. that she also had been raped. R.H. did not say who the perpetrator was, and after D.H. tried guessing the perpetrator and then guessed Appellant, R.H. could not stop crying and said, "[i]t was dad." D.H. testified she "lost it[]" and left, at first intending to go home to confront her husband because she "knew that what [her] daughter was saying was true[,]" but D.H. instead went to her best friend's house where she contacted the police. According to D.H., she and R.H. spoke about the last instance of abuse but never spoke about the frequency of the assaults.

D.H. testified that she helped pinpoint the date of the sexual assault that was the subject of R.H.'s outcry, which she determined was a night about two weeks prior to the outcry, when D.H. and her son were not at home and Appellant had asked

10

for R.H. to come to the house because he needed her to bring her laptop so he could buy a diagnostic tool for his job as a mechanic. D.H. testified that Appellant picked up R.H. from her grandparents' house in the evening and took her home. D.H. agreed that this was not the occasion when she and her son went to the store and left R.H. and Appellant alone at home.

D.H. testified that she took R.H. to the forensic exam and a SANE exam, which was "very difficult[]" for R.H. After making the law enforcement report, D.H. kept R.H. separated from Appellant, and R.H. moved to D.H.'s parents' house. D.H. testified that R.H. does not get confused about the abuse she endured but that she does have difficulty differentiating specific times that the abuse occurred. According to D.H., Children's Safe Harbor recommended that she get counseling for R.H., R.H. received counseling for a few months from where it was recommended, but she did not complete it because she no longer wanted to go. D.H. testified that R.H. did get counseling elsewhere "[n]umerous times[,]" and that the process has been difficult for R.H.

D.H. testified that for the past five years, she worked outside the home, and at the time of trial she worked twelve-hour shifts but had also worked from 6 a.m. to 2 p.m. at times during those years. Appellant worked every day during the week as a mechanic and worked long days, but he could leave the house whenever he wanted because he did not have a set schedule. D.H. agreed that at the beginning of the

11

investigation she wanted it to be over with and felt like she was caught in the middle because law enforcement advised her to continue to live with Appellant during the investigation to ensure he did not flee. According to D.H., after the detectives collected Appellant's DNA, she confronted him about the abuse, he denied it, and she felt conflicted because she was told to stay with him despite the investigation taking so long and she was "having to pretend everything was okay while [she] was with him, knowing that [she] knew the truth." She testified that eventually R.H. moved back home while the investigation was ongoing because "remote school was done," and Appellant was the only one who could take the children to school because of D.H.'s work schedule so she had no choice but for him to take them to school. D.H. testified that she was protective of the children during this time, that she would text or talk to the children whenever he would take them to school, and that whenever he was alone with R.H. that D.H. would be on the phone or texting with R.H. According to D.H., she did not coach R.H. to make any sexual abuse allegations against her father and at trial D.H. was testifying in R.H.'s support.

Testimony of Investigator Lance Holden

Lance Holden is a Crime Scene Investigator with Montgomery County. Holden testified that on May 6, 2020, he helped execute a search warrant at Appellant's home. Holden was advised that the investigation was related to a sexual assault and the warrant was to find trace evidence or bodily fluids. According to

Holden, once on the scene he analyzed the rooms with an alternative-light source and took photographs. He wore specialized goggles that allowed him to see cloudy areas of "possible sources of semen." He explained he circled twenty-seven spots to be tested with acid phosphatase (AP) test. If the AP test is positive, then the spot is "presumptive positive for semen[]" and sent off for testing. He cuts samples of presumptive positive spots and put them in individual envelopes or bags to submit as evidence, and for each sample he writes on the envelope or bag the case number, date, and from where the sample was located. He did this with the piece of comforter from R.H.'s room, and the sample was admitted into evidence at trial as State's Exhibit 24. Investigator Holden also took a buccal swab and obtained a DNA sample from the inside of Appellant's cheek, put the cotton swabs in DNA boxes and put them in manila envelopes with the cause number and name and where he got it, and submitted it as evidence.

Testimony of Amanda Domer

Amanda Domer, a forensic scientist with the Texas Department of Public Safety Crime Lab in Houston, testified. In this case she tested evidence and performed the DNA profile interpretation and comparisons. She recognized State's Exhibit 24 as the envelope labeled as "cutting from White Comforter No. 2" that was submitted to the laboratory and bearing the barcode sticker with the unique case number assigned to the case when the evidence was brought into the laboratory.

13

According to Domer, the submission form that was submitted at the same time that the evidence was submitted listed the item as a "cutting from White Comforter No. 2" with the source listed as "white comforter from bed, R[.H.]." Domer testified that the envelope bears a sticker with her initials, which is the proper seal she placed on the envelope after the analysis of the cutting from the comforter.

Domer tested the entire material instead of just one specific area, and from the initial AP test, a test that is a color-changing test that if positive is presumptive for semen, she had two positive areas, one slightly weaker than the other. Because she had a presumptive positive for semen on the cutting, she then moved to the DNA comparison and looked at the evidence profile alone without any known samples and determined that the profile was from a single contributor. In comparing Appellant's known DNA profile with the sperm cell fraction from the evidence profile from the cutting from the white comforter, Domer testified that she concluded that "[t]he probability of obtaining this evidence profile if the DNA came from [Appellant] is 11.7 octillion times greater than the probability of obtaining the profile if the DNA came from an unrelated, unknown individual." Domer testified that 11.7 octillion would be written as "11.7 with 26 zeros behind that 7." According to Domer, this conclusion indicates support for the proposition or the scenario that [Appellant] is a possible contributor of the profile. Domer testified that she cannot determine how long a semen stain has been present on material, but that some studies

14

have shown that seminal stains can remain on material for several years depending on how the material is handled, and that washing, heat, humidity, and exposure to sunlight can affect how long the stain remains.

Denial of Motion for Mistrial

In Appellant's first issue, he argues that the trial court erred when it denied his motion for mistrial. According to Appellant, the trial court should have granted Appellant's motion for mistrial after Appellant moved for a mistrial based on the following testimony elicited from D.H. on direct examination by the State:

> Q. And then, here we are finally at the trial, two years later. How has that been for [R.H.] in this time leading up to trial?
>
> A. A lot better now.
>
> Q. How so?
>
> A. Well, I mean, first of all, he's in jail. So, he can't hurt her anymore.
>
> Q. Did [R.H.] --
>
> [Defense Counsel]: Your Honor, I'm going to object to that and ask that it be struck from the record.
>
> THE COURT: Sustained, and asking the jury to disregard the last comment made by the witness.
> Any further request?
>
> [Defense Counsel]: We would ask for a mistrial?
>
> THE COURT: Response to mistrial?
>
> [Prosecutor]: Judge, I don't believe this rises to the level of a mistrial, if we could approach?

15

THE COURT: I'm denying the motion for mistrial.

Appellant argues that D.H.'s testimony that Appellant was in jail constituted "a prejudicial error that definitely harmed appellant, tainted the Jurors, and compromised appellant's presumption of innocence[,]" and that a "simple instruction to disregard the statement would not be enough to repeal the harm that the appellant suffered." In support of his argument, Appellant contends that the error in this case is comparable to those at issue in *Estelle v. Williams*, 425 U.S. 501 (1976) and *Randle v. State*, 805 S.W.2d 582 (Tex. App.—Beaumont 1991), *rev'd*, 826 S.W.2d 943 (Tex. Crim. App. 1992).

In *Estelle*, the Supreme Court concluded that "although the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." 425 U.S. at 512-13.

The *Randle* opinion cited by Appellant was reversed by *Randle v. State*, 826 S.W.2d 943 (Tex. Crim. App. 1992). The 1992 *Randle* opinion by the Texas Criminal Court of Appeals involved a defendant who was compelled to appear in court in shackles, and the Texas Court of Criminal Appeals concluded that if a defendant objects to being put to trial while dressed in prison clothes, he should not

16

be compelled to stand trial in that attire because it would result in a violation of the defendant's right to be presumed innocent. *See Randle*, 826 S.W.2d at 944-45. Appellant argues that, although he was not wearing jail clothes or physical restraints, the fact that D.H. told the jury that Appellant was in jail had the same effect in compromising his presumption of innocence.

We review the trial court's denial of a motion for mistrial for an abuse of discretion, viewing the evidence in the light most favorable to the trial court's ruling, and considering only those arguments before the court at the time of the ruling. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). We must uphold the ruling if it was within the zone of reasonable disagreement. *Id.* A mistrial is the appropriate remedy only when the objected-to events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant. *See Young v. State*, 137 S.W.3d 65, 71 (Tex. Crim. App. 2004). In most instances, an instruction to disregard will cure the prejudicial effect. *See Wesbrook v. State*, 29 S.W.3d 103, 115-116 (Tex. Crim. App. 2000). An instruction to disregard is presumptively inadequate only in the most blatant cases; only offensive or flagrantly improper conduct warrants reversal when there has been an instruction to disregard. *Moore v. State*, 999 S.W.2d 385, 405 (Tex. Crim. App. 1999); *Wilkerson v. State*, 881 S.W.2d 321, 327 (Tex. Crim. App. 1994).

A mistrial is required only in extreme circumstances where the prejudice is incurable because it "is of such character as to suggest the impossibility of withdrawing the impression produced on the mind of the jurors." *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999); *see also Ocon*, 284 S.W.3d at 884. Because a mistrial is an extreme remedy, "a mistrial should be granted 'only when residual prejudice remains' after less drastic alternatives are explored." *Ocon*, 284 S.W.3d at 884-85 (quoting *Barnett v. State*, 161 S.W.3d 128, 134 (Tex. Crim. App. 2005)).

A defendant has a right to a presumption of innocence, and indicia like prison attire or testimony which discloses to the jury that the defendant is incarcerated violates that right. *See Estelle*, 425 U.S. at 503-04; *Randle*, 826 S.W.2d at 944-45; *Pierce v. State*, 234 S.W.3d 265, 268 (Tex. App.—Waco 2007, pet. ref'd). But an instruction to disregard can cure the prejudicial effect of such a reference. *See McBurnett v. State*, 629 S.W.3d 660, 663 (Tex. App.—Fort Worth 2021, pet. ref'd) (distinguishing the facts from *Randle*, and concluding that the prejudicial effect of "a single brief, unsolicited" reference to defendant's incarceration by officer's testimony that he obtained a DNA sample from defendant when the officer visited defendant at the jail was cured by prompt instruction for jury to disregard); *Pierce*, 234 S.W.3d at 268 (noting that defendant was in civilian clothing and the prejudicial effect of testimony by a witness that was with the defendant on the night of the

18

offense that she saw the defendant that morning when she "was going through booking . . . over at the jail[]" was cured by the trial court's instruction to disregard the witness's jail reference); *Sharper v. State*, 22 S.W.3d 557, 558-59 (Tex. App.—Texarkana 2000, no pet.) (unlike in *Randle*, the defendant did not appear before the jury in jail attire, and the prejudicial effect caused by the prosecutor's question and the co-defendant witness's response that indicated that the defendant had been in "hold-over" at the jail with the co-defendant witness in the days prior to trial was cured by an instruction to disregard).

Unlike *Estelle* and *Randle*, the present case involves a brief, unsolicited reference to Appellant being in jail and Appellant did not appear in shackles or prison attire. We conclude that the brief unsolicited reference made by the witness in this case, standing alone, was cured by an instruction to disregard. *See McBurnett*, 629 S.W.3d at 663 (citing *Smith v. State*, 491 S.W.3d 864, 873 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd)). The trial court gave a prompt instruction to the jury to disregard D.H.'s inadvertent reference to Appellant's incarceration and we presume the jury followed the instruction which cured any prejudicial effect. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (an instruction to a jury to disregard is generally considered sufficient to cure an impropriety during trial, and we generally presume that a jury follows the judge's instruction). There is no indication in the record that the State's question was intended to elicit D.H.'s

19

mention of Appellant's incarceration. The reference was not flagrant and was made on only one occasion, and it does not appear that it was emphasized or repeated at any other point in the proceeding. Based on the record, the trial court could have reasonably concluded that D.H.'s reference to Appellant's incarceration is not of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jury. *See Ladd*, 3 S.W.3d at 567; *see also Williams v. State*, No. 06-04-00125-CR, 2005 Tex. App. LEXIS 2749, at \*\*1-4 (Tex. App.— Texarkana Apr. 12, 2005, no pet.) (mem. op., not designated for publication) (prosecutor's question that could be interpreted as a reference to the fact that the appellant was being held in custody at the time of trial was not of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jury). We conclude that any prejudice from the reference to Appellant's incarceration was not incurable and the trial court did not abuse its discretion in denying the motion for mistrial. *See Ocon*, 284 S.W.3d at 884; *Ladd*, 3 S.W.3d at 567. Because we find no error in the trial court's denial of Appellant's motion for mistrial, we need not conduct a harm analysis. *See Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004); *see also* Tex. R. App. P. 44.2. Issue one is overruled.

Sufficiency of the Evidence

In Appellant's second issue, he argues that the trial court erred by denying his motion for directed verdict.[2] In his third issue, Appellant challenges the legal sufficiency of the evidence supporting his conviction. Because we review the denial of a motion for instructed verdict under a sufficiency analysis, we consider these two issues together. *See Dunn v. State*, 951 S.W.2d 478, 480 (Tex. Crim. App. 1997) (an appeal from denial of an instructed verdict challenges the legal sufficiency of the evidence to support a conviction); *see also Freeman v. State*, 340 S.W.3d 717, 730 (Tex. Crim. App. 2011) (equating "instructed verdict" with "directed verdict").

> A person commits the offense of continuous sexual abuse of a child if:
>
> (1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and
> (2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is: (A) a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense[.]

Tex. Penal Code Ann. § 21.02(b)). Section 21.02 of the Texas Penal Code defines "act of sexual abuse" as including, among other things, an act that constitutes the offense of aggravated sexual assault. *Id.* § 21.02(c)(4). A person commits the offense

---

[2] After the State presented its case-in-chief, the defense moved for a directed verdict on the grounds that "there's no evidence that's been submitted that a reasonable jury could possibly find a -- find the defendant guilty on." After a response by the State, the trial court denied the motion.

of aggravated sexual assault of a child if the person intentionally or knowingly causes the penetration of the anus or sexual organ of a child by any means and the victim is younger than fourteen years of age. *Id.* § 22.021(a)(1)(B)(i), (a)(2)(B). The State need not prove the exact dates of the abuse, only that "there were two or more acts of sexual abuse that occurred during a period that was thirty or more days in duration." *Brown v. State*, 381 S.W.3d 565, 574 (Tex. App.—Eastland 2012, no pet.); *Lane v. State*, 357 S.W.3d 770, 773-74 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *see also* Tex. Penal Code Ann. § 21.02(d) ("[M]embers of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed.").

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.

22

Crim. App. 2007). The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020) (citing *Esquivel v. State*, 506 S.W.2d 613, 615 (Tex. Crim. App. 1974)).

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359-60 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)). The testimony of a child victim, standing alone and without corroboration, is sufficient to support a conviction for sexual assault of a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07 (providing that a child's testimony alone is sufficient to support a conviction for sexual assault when either the victim informed someone other than the defendant within one year after the offense allegedly occurred or when the child is under the age of seventeen at the time of the alleged offense); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978).

Appellant argues that the evidence is legally insufficient to support his conviction because no evidence was presented that corroborated the allegations of sexual abuse made by R.H. Appellant contends that R.H.'s allegations that Appellant sexually abused her two or three times a day for almost four years "do not make any sense[,]" especially considering the testimony that some of the time she would stay at her grandparents' home so she could attend a different school and that Appellant worked all the time and would get home late at night. Appellant argues that the only evidence the State had to corroborate R.H.'s "conflictive" testimony is "a blanket that nobody knows the history of."

The jury, in its role as factfinder, heard R.H.'s testimony and could have found her testimony credible. The jury heard R.H. testify in detail of her father sexually assaulting her from when she was eleven years old to fourteen years old and that the assaults occurred two to three times a day in their home. As noted above, the testimony of a child victim, standing alone and without corroboration, is sufficient to support a conviction for sexual assault of a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07; *Garcia*, 563 S.W.2d at 928. The jury heard Carmona, the forensic interviewer, testify regarding the details R.H. gave during the forensic interview regarding the offenses that had occurred up until weeks before the interview. The jury also heard Detective Ward testify that she understood that R.H. reported that her father sexually abused her from about 2017 to 2020, from when R.H. was eleven

24

years old to fourteen years old. The jury heard D.H. testify that she and Appellant did not have sex in R.H.'s bedroom. The jury heard Investigator Holden testify about how he collected the sample from R.H.'s comforter, that he obtained a buccal swab from Appellant, and that he submitted them for testing. The jury could have considered the testimony of Domer, the forensic scientist, who tested R.H.'s comforter and concluded that "[t]he probability of obtaining this evidence profile if the DNA came from [Appellant] is 11.7 octillion times greater than the probability of obtaining the profile if the DNA came from an unrelated, unknown individual." Based on the evidence at trial, the jury could have concluded that "there were two or more acts of sexual abuse that occurred during a period that was thirty or more days in duration." *See Brown*, 381 S.W.3d at 574; *Lane*, 357 S.W.3d at 773-74; *see also* Tex. Penal Code Ann. § 21.02(d). Viewing the evidence in the light most favorable to the verdict and deferring to the jury's authority to determine the credibility of witnesses and the weight to give their testimony, we conclude that a reasonable fact finder could have found the essential elements of the offense beyond a reasonable doubt. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1); *Metcalf*, 597 S.W.3d at 855; *Brooks*, 323 S.W.3d at 902 n.19; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13; *Garcia*, 563 S.W.2d at 928. We overrule issues two and three.

Having overruled Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on September 26, 2023
Opinion Delivered December 20, 2023
Do Not Publish

Before Horton, Johnson and Wright, JJ.